Mark A. ALLEN, Appellant

v.

CENTRAL INTELLIGENCE AGENCY et al.

No. 80–1380.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 8, 1980.

Decided Nov. 12, 1980.

---

James H. Lesar, Washington, D. C., for appellant.

Wendy M. Keats, Atty., Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellees.

Before WRIGHT, Chief Judge, and MIKVA and EDWARDS, Circuit Judges.

Opinion for the court filed by Chief Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Chief Judge:

This case concerns a request under the Freedom of Information Act (FOIA)[1] by appellant Mark A. Allen that the Central Intelligence Agency (CIA) disclose a 15-page document containing information related to the assassination of President Kennedy. Citing Exemption 2[2] of the FOIA, the CIA has refused to release portions of the document containing its filing and routing instructions. Other portions of the document have been withheld under Exemptions 1[3] or 3[4] of the FOIA. The District Court granted summary judgment in favor of the CIA with respect to all three exemptions.[5] Finding merit in many of the appel-

---

1. 5 U.S.C. § 552 (1976).

2. 5 U.S.C. § 552(b)(2) (1976). Exemption 2 covers matters that are "related solely to the internal personnel rules and practices of an agency."

3. 5 U.S.C. § 552(b)(1) (1976). Exemption 1 covers matters authorized by Executive Order to be kept secret and that "are in fact properly classified." For the full text of Exemption 1, see note 22 infra.

4. 5 U.S.C. § 552(b)(3) (1976). Exemption 3 covers matters exempted from disclosure by statute. For the full text of Exemption 3, see note 23 infra.

5. The unreported opinion, Allen v. CIA, D.D.C. Civil Action No. 78–1743, filed February 6, 1980, is reprinted in appellant's Appendix (App.) at 115–118.

lant's arguments, we reverse with respect to Exemption 2. And with respect to Exemptions 1 and 3, we vacate and remand for an *in camera* inspection to determine the applicability of the exemptions.

## I. FACTS AND PROCEDURAL BACKGROUND

Mark Allen has for a number of years engaged in extensive research concerning the murder of President Kennedy.[6] On July 24, 1978 he made an FOIA request for a CIA document identified as Item No. 509–803. This document contains CIA-developed information about the activities of Lee Harvey Oswald in Mexico City during the seven-week period prior to the President's assassination.[7] The CIA refused to release the document on the basis of Exemptions 1, 2, and 3 of the FOIA.

On September 18, 1978 Allen initiated this FOIA suit in the District Court, challenging the CIA's withholding of the requested document. In January 1979 the CIA moved to dismiss the suit and supported the motion with the affidavit of CIA Officer Robert E. Owen.[8] The District Court granted the motion.[9] Shortly after Allen had filed a notice of appeal with this court, however, the CIA asked us to remand the case for supplementing of the record. We granted the CIA's motion on October 31, 1979 and remanded the case for proceedings not inconsistent with *Founding Church of Scientology v. Bell*, 603 F.2d 945 (D.C.Cir. 1979).[10] During the subsequent proceedings the CIA released portions of the requested document[11] and filed a supplemental affidavit of CIA Officer Owen.[12] Meanwhile, Allen made several requests for discovery, all of which were denied by the District Court. On February 6, 1980 the District Court granted summary judgment in favor of the CIA, without having made an *in camera* inspection of the document. Allen then brought this appeal, challenging the denial of discovery[13] and the grant of summary judgment.

## II. THE FILING AND ROUTING INSTRUCTIONS

The CIA withheld those portions of the document containing filing and routing instructions on the basis of Exemption 2 of the FOIA, which exempts from disclosure matters "related solely to the internal personnel rules and practices of an agency."[14]

---

6. Brief for appellant at 5.

7. Brief for appellees at 6.

8. Affidavit of Robert E. Owen, January 9, 1979, *reprinted at* App. 16–20. The affidavit incorporated by reference, and included as an attachment, an earlier affidavit by CIA Officer Charles A. Briggs. *See* App. 22–38. The Briggs affidavit pertained to an unrelated FOIA request that included the document at issue in the instant case.

9. The unreported opinion, *Allen v. CIA*, D.D.C. Civil Action No. 78–1743, filed January 12, 1979, is reprinted at App. 62–63.

10. The unpublished *per curiam* order is reprinted at App. 65A.

11. In releasing portions of the document the CIA excised certain classification markings and stamps. Allen, noting that the Agency cites no exemption, challenges the CIA's withholding of these markings. Although appellant's request for these markings and stamps strikes the CIA as trivial and frivolous, *see* brief for appellees at 2 n.**, it is quite clear that matters are exempt from disclosure under the FOIA only when one or more of the nine exemptions is applicable. *See EPA v. Mink*, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). Here, since no exemption has been cited by the CIA, we are compelled to hold that the Agency must release the classification markings and stamps pertaining to the portions of the document that have been declassified and released. The CIA is, of course, free to indicate through appropriate markings—but not excision—that the classification designations are no longer applicable.

12. Supplemental Affidavit of Robert E. Owen, January 11, 1980, *reprinted at* App. 86–94.

13. Because we reverse as to the Exemption 2 claims and also direct the District Court to conduct *in camera* inspection with respect to the Exemption 1 and 3 claims, we do not take up appellant's challenge to the District Court's denial of discovery. Such discovery will be unnecessary inasmuch as the District Court will make an *in camera* inspection of the document to determine whether the withheld portions are clearly exempt.

14. 5 U.S.C. § 552(b)(2) (1976).

Appellant Allen argues that Exemption 2 does not cover filing and routing instructions.[15] The District Court held the exemption applicable.[16]

We disagree. In *Jordan v. U. S. Dep't of Justice*, 591 F.2d 753 (D.C.Cir.1978) (*en banc*), this court held "that the phrase 'internal personnel' [in Exemption 2] modifies both 'rules' and 'practices'." *Id.* at 764. Although it is thus clear that "Congress intended the exemption to be read as a composite clause, covering only internal *personnel* matters," *id.* (emphasis added), it is still necessary to examine the exemption's legislative history to ascertain its scope. Unfortunately, the House and Senate reports on the legislation that enacted Exemption 2 differ in the scope they attributed to the exemption. The Senate report stated:

> Exemption No. 2 relates only to the internal personnel rules and practices of an agency. Examples of these may be rules as to personnel's use of parking facilities or regulation of lunch hours, statements of policy as to sick leave, and the like.[17]

The House report described the exemption in broader terms:

> 2. Matters related solely to the internal personnel rules and practices of any agency: Operating rules, guidelines, and manuals of procedure for Government in-

vestigators or examiners would be exempt from disclosure, but this exemption would not cover all "matters of internal management" such as employee relations and working conditions and routine administrative procedures which are withheld under the present law.[18]

■ The Supreme Court addressed the conflict between the two reports in *Dep't of Air Force v. Rose*, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976).[19] The Court held that the Senate report provided a better indication of congressional intent. *Id.* at 365–367, 96 S.Ct. at 1596–1602. In the instant case there is little doubt that the narrow scope of Exemption 2 reflected in the Senate report does not extend to the filing and routing instructions. That report, by the examples of exempt matters it gives in the portion quoted above, makes clear that the exemption covers nothing more than trivial administrative personnel rules generally concerning hours, pay, and permitted activity while at work. Filing and routing instructions for a document, however, are plainly not included in that narrow category of administrative personnel rules and are totally unlike any of the examples cited.[20] We thus share the view of appellant that the filing and routing instructions are outside the ambit of Exemption 2.[21] The District Court's holding

---

15. Brief for appellant at 26–27.

16. *Allen v. CIA, supra* note 5, slip op. at 2, App. 116.

17. S.Rep.No.813, 89th Cong., 1st Sess. 8 (1965).

18. H.R.Rep.No.1497, 89th Cong., 2d Sess. 10 (1966) U.S.Code Cong. & Admin.News 1966, p. 2418.

19. The *Rose* case involved an FOIA request by then current and former student law review editors for "case summaries of honor and ethics hearings, with personal references or other identifying information deleted, maintained in the United States Air Force Academy's Honor and Ethics Code reading files[.]" *Dep't of Air Force v. Rose*, 425 U.S. 352, 355, 96 S.Ct. 1592, 1596, 48 L.Ed.2d 11 (1976).

20. It is even doubtful that the filing and routing instructions would be exempt under the broader reading of the exemption given in the House

report. The Supreme Court in *Rose* suggested that the focus of the House report was "to prevent the circumvention of agency regulations that might result from disclosure to the subjects of regulation of the procedural manuals and guidelines used by the agency in discharging its regulatory function." *Dep't of Air Force v. Rose, supra* note 19, 425 U.S. at 364, 96 S.Ct. at 1600. Disclosure of filing and routing instructions, of course, would not cause such "circumvention of agency regulations."

21. The CIA cites *Dep't of Air Force v. Rose, supra* note 19, and *Lesar v. U. S. Dep't of Justice*, 636 F.2d 472 (D.C.Cir.1980), for the notion that "exemption [2] applies to 'routine matters' of 'merely internal significance' in which the public lacks any substantial or legitimate interest." Brief for appellees at 43 (*citing Lesar*, 636 F.2d at 485, and *Rose*). Neither opinion, however, goes so far as to say, as the CIA suggests, that trivial matters unrelated to *personnel* are covered by Exemption 2.

to the contrary is accordingly reversed and the CIA is directed to release those portions of the document containing filing and routing instructions.

## III. THE PORTIONS OF THE DOCUMENT WITHHELD UNDER EXEMPTIONS 1 AND 3

The CIA relies on Exemptions 1 and 3 as justification for its withholding of portions of the document other than the filing and routing instructions. Exemption 1 permits withholding of matters that are authorized by Executive Order to be kept secret and "are in fact properly classified pursuant to such Executive order[.]" [22] Exemption 3 permits nondisclosure of information "specifically exempted from disclosure by statute[.]" [23] Allen contends that summary judgment was improper with respect to Exemptions 1 and 3 because the two affidavits presented by the CIA failed to demonstrate that the withheld portions of the document come within the two exemptions. We agree.

### A. *The Adequacy of the CIA Affidavits*

The FOIA directs trial courts to conduct *de novo* review of the applicability of the particular exemptions cited by the agency to the withheld matters. 5 U.S.C. § 552(a)(4)(B) (1976). To assist the trial court in making its *de novo* review agencies are expected to submit affidavits demonstrating the applicability of the exemptions. In some cases the agency affidavits will provide a sufficient basis for decision without *in camera* inspection. In *Hayden v. National Security Agency/Central Security*

*Service,* 608 F.2d 1381 (D.C.Cir.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980), this court enunciated the standard for granting such summary judgment:

[T]he affidavits must show, with reasonable specificity, why the documents fall within the exemption. The affidavits will not suffice if the agency's claims are conclusory, merely reciting statutory standards, or if they are too vague or sweeping. If the affidavits provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without *in camera* review of the documents.

\* \* \*

*Id.* at 1387 (footnotes omitted).

■ In the instant case we are of the view that the CIA affidavits were not "reasonabl[y] specific[ ]," but rather were "conclusory, merely reciting statutory standards," and that summary judgment was accordingly inappropriate.

### 1. *The Exemption 1 claims*

Exemption 1 requires that the most recent classification of a requested document be in conformity with both the procedural and substantive criteria of the then-applicable Executive Order. *See Lesar v. U. S. Dep't of Justice,* 636 F.2d 472, 483 (D.C.Cir.1980) (*citing* S.Rep.No.1200, 93d Cong., 2d Sess. 11–12 (1974) U.S.Code Cong.

---

Rather, the cases discuss whether nontrivial internal *personnel* rules and practices are immune from disclosure. Both opinions conclude that they are not.

**22.** 5 U.S.C. § 552(b)(1) (1976). The exemption reads:

(b) This section does not apply to matters that are—

(1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order[.]

**23.** 5 U.S.C. § 552(b)(3) (1976). The exemption reads:

(b) This section does not apply to matters that are

\* \* \* \* \* \*

(3) specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld[.]

& Admin.News 1974, pp. 6267, 6285; *Zweibon v. Mitchell*, 516 F.2d 594, 642 (D.C. Cir.1975) (*en banc*) (*quoting* H.R.Rep.No. 1380, 93d Cong., 2d Sess. 12 (1974) U.S.Code Cong. & Admin.News 1974, p. 6267), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976). While in the instant case both affidavits of CIA Officer Owen state [24] that the document was properly classified under Executive Order 12065,[25] they are drawn in conclusory terms that merely parrot the language of the Executive Order. There is no basis on which a trial court might conclude that the procedural requirements of Executive Order 12065 have been satisfied. For instance, Section 1–501 of Executive Order 12065 requires that

> [a]t the time of original classification, the following shall be shown on the face of paper copies of all classified documents:
>
> (a) the identity of the original classification authority;
>
> (b) the office of origin;
>
> (c) the date or event for declassification or review; and
>
> (d) one of the three classification designations defined in Section 1–1.[26]

The two affidavits in the present case, however, indicate neither the "identity of the original classifi[er]" nor "the date or event for declassification or review." [27]

Owen's affidavits are also defective in that they do not permit a trial court to conclude that the document was classified in conformity with the substantive requirements of Executive Order 12065. Representative of the conclusory nature of the affidavits is that portion of Owen's supplemental affidavit purporting to justify the withholding of almost the entirety of pages 4–9 of the document:

> 12. Deletions designated with the letters "A & B" on pages 4 through 9, in paragraphs 5 through 12, show where portions were deleted to protect against the disclosure of intelligence sources and methods. The substance in these paragraphs concern one sequence of events, which has been the subject of a number of other documents which have been released for public access. The material is presented in such a manner, in this document, that to name the principal figures would result in the eventual identification of the intelligence sources who produced the information and the intelligence methods used in the process. Such a disclosure would compromise the intelligence sources and methods involved, which are currently viable and functioning. The information is thus exempt from release pursuant to FOIA exemptions (b)(1) and (b)(3) * * *.[28]

The affidavit's reliance on such expansive phrases as "intelligence sources and meth-

**24.** Affidavit of Robert E. Owen, *supra* note 8, at 1289, App. 18; Supplemental Affidavit of Robert E. Owen, *supra* note 12, at 4, App. 89.

**25.** 3 C.F.R. 190 (1978 Compilation) (1979). While the original Owen affidavit indicates that Owen's predecessor, Charles A. Briggs, had reviewed the document's classification under Executive Order 11652, 3 C.F.R. 678 (1971–1975 Compilation) (1976), neither affidavit of Owen states the Executive Order under which the document was originally classified. Trial courts, in reviewing *de novo* the classification of documents, should refer to the Executive Order in effect at the time of the latest classification determination. *See Lesar v. U. S. Dep't of Justice, supra* note 21, 636 F.2d at 478. The District Court in the instant case thus acted properly in using Executive Order 12065 as its reference for evaluating the propriety of the document's classification. *See Allen v. CIA, supra* note 5, slip op. at 3, App. 117.

**26.** Executive Order 12065, § 1–501, 3 C.F.R. 193 (1978 Compilation) (1979).

**27.** We do not mean to suggest that the classification was procedurally defective, but only that the affidavits do not demonstrate procedural conformity and that summary judgment was thus improper. Moreover, actual procedural defects do not necessarily require the document to be disclosed. *See Lesar v. U.S. Dep't of Justice, supra* note 21, 636 F.2d at 478 (procedural consequences may vary); *id.*, 636 F.2d at 484 (procedural defect in original classification does not bar later classification under Executive Order 12065).

**28.** Supplemental Affidavit of Robert E. Owen, *supra* note 12, at 1289, App. 93.

ods," "sequence of events," and "process" falls far short of providing the "reasonable specificity" that this court has held is required for summary judgment without *in camera* inspection.[29] Indeed, the statement does not adequately demonstrate that the substantive standard for classification under Executive Order 12065 has been met. Section 1–302 of that Order states that information "may not be classified unless an original classification authority also determines that its unauthorized disclosure reasonably could be expected to cause at least identifiable damage to the national security."[30] Here, though, the CIA relies on the trial court to draw an inference of "identifiable damage."[31] Unfortunately, the description fails to indicate whether disclosure of this document will hasten the "eventual identification of * * * intelligence methods" that would likely occur even without disclosure of the document.

The affidavits also afford no basis for a conclusion that all "reasonably segregable" nonexempt portions of the document have been released.[32] They do not even contain an assertion to that effect. The CIA argues that by releasing portions of the docu-

ments on remand it made clear that no segregable nonexempt portions remain withheld. But release of portions of the document on remand may reflect nothing more than the Agency's attempt to convince the reviewing court of its good faith.[33] To accept the CIA's argument would constitute an abandonment of the trial court's obligation under the FOIA to conduct a *de novo* review.[34]

### 2. *The Exemption 3 claims*

For purposes of its Exemption 3 claims the CIA invokes Sections 403(d)(3)[35] and 403g[36] of Title 50, which exempt from disclosure information that might reveal CIA "intelligence sources and methods." While this court has held that these two statutory provisions are exempting statutes for purposes of Exemption 3, *see Goland v. CIA,* 607 F.2d 339 (D.C.Cir.1978), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980), we are nevertheless of the view that the District Court erred in granting summary judgment with respect to Exemption 3.

---

29. *See, e. g., Hayden v. National Security Agency/Central Security Service,* 608 F.2d 1381 (D.C.Cir.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980).

30. Executive Order 12065, § 1–302, 3 C.F.R. 193 (1978 Compilation) (1979).

31. *See* brief for appellees at 32. In a footnote the CIA suggests that the Briggs affidavit appended to the original Owen affidavit, *see* note 8 *supra,* "describe[s] at greater length how the identifiable harm cited above can come about." Brief for appellees at 32 n.9. The Briggs affidavit, however, described in general terms the classification of 1,264 documents, one of which was the document involved in this litigation. It is totally unclear to what extent that description pertains to this document.

32. The FOIA states that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt * * *." 5 U.S.C. § 552(b) (1976). The burden is on the agency to demonstrate that no segregable, nonexempt portions remain withheld. *See Ray v. Turner,* 587 F.2d 1187, 1214 (D.C.Cir.1978) (Wright, C. J., concurring).

33. For example, the Agency may have voluntarily released only those portions that were

most clearly nonexempt, while continuing to withhold those portions that were not clearly nonexempt.

34. In addition to the defects of the affidavits just noted, Allen argues that the affidavits fail to demonstrate compliance with § 3–303 of Executive Order 12065, which requires declassification when "the need to protect [the classified] information [is] outweighed by the public interest in disclosure of the information." 3 C.F.R. 197 (1978 Compilation) (1979); *see* brief for appellant at 14–16. Allen also speculates as to the contents of the document, contending that they have all been previously released in other documents. *See* brief for appellant at 17–19. Because we hold that the affidavits fail to support the award of summary judgment for the reasons already mentioned in text, we need not address these additional arguments. These additional concerns will, of course, be resolved when the trial court conducts an *in camera* inspection of the document, as is required by our decision today.

35. 50 U.S.C. § 403(d)(3) (1976).

36. 50 U.S.C. § 403g (1976).

With respect to those portions of the document withheld under Exemption 3, the affidavits fail to demonstrate that the portions are clearly exempt. Indeed, the affidavits of Robert Owen are no less conclusory or nonsupportive with respect to the Exemption 3 claims than they are with respect to the Exemption 1 claims. The CIA's affidavits do little more than parrot the language of Section 403(d)(3) by stating that "intelligence sources and methods" will be compromised if the document is disclosed.[37] But as this court's opinion in *Sims v. CIA*, (D.C.Cir. No. 79–2203, decided September 29, 1980), demonstrates, the phrase "intelligence sources and methods" is susceptible to varying interpretations, some of which are unacceptably broad.[38] Thus, unless greater specificity is provided regarding the nature of the "intelligence sources and methods," it is impossible for a trial court to conclude that withholding of portions of the document under Exemption 3 was proper.

In addition to the failure of the affidavits to show that the portions withheld under Exemption 3 are clearly exempt, they also fail to indicate whether there is any segregable, nonexempt information still withheld—the same defect that exists with respect to the portions withheld under Exemption 1.

### B. In Camera *Inspection in FOIA Cases*

As the previous section demonstrates, the District Court erred in granting summary judgment in favor of the CIA on Exemptions 1 and 3. While in certain cases it might be appropriate to remand for a taking of further affidavits, in the instant case we are of the view that the District Court should conduct an *in camera* inspection of the document. To understand why we hold that *in camera* inspection is required in the instant case, however, we must first look at the terms and legislative history of the FOIA.

### 1. *The legislative history of the 1974 and 1976 Amendments to the FOIA*

Underlying the enactment of the FOIA in 1966 was the congressional desire to provide "full agency disclosure unless information is exempted under clearly delineated statutory language[.]" S.Rep.No. 813, 89th Cong., 1st Sess. 3 (1965). The courts were given an especially significant role to play in enforcement of the FOIA. Federal District Courts were granted "jurisdiction to enjoin the agency from the withholding of agency records and to order the production of any agency records improperly withheld from the complainant."[39] In such cases, Congress explicitly provided that "the court shall determine the matter de novo and the burden shall be upon the agency to sustain its action."[40]

Unfortunately, the judiciary was at first reluctant to assume fully the difficult supervisory role that Congress had established for it. In *EPA v. Mink*, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed. 119 (1973), the Supreme Court held that District Courts, in reviewing nondisclosure of a document under Exemption 1, could not engage in *in camera* inspection of the document. Rather, the Court held that reviewing courts were only charged with the responsibility of ensuring the procedural—not substantive—propriety

---

**37.** *See* text at note 28 *supra*; Supplemental Affidavit of Robert E. Owen, *supra* note 12, at 4, 7–9, App. 89, 92–94. The supplemental affidavit, however, did provide greater specificity as to one of the withheld portions, indicating that it identified "some CIA staff employees and organizational components." *Id.* at 6 ¶ 9, App. 91.

**38.** In *Sims* the CIA had argued that "intelligence source" means "'any individual, entity or medium that is engaged to provide, or in fact provides, the CIA with substantive information having a rational relation to the nation's exter-

nal national security.'" *Sims v. CIA*, (D.C.Cir. No. 79–2203, decided Sept. 29, 1980) (slip op. at 14–15) (*quoting* brief for appellants in *Sims* at 24). This court rejected that definition, noting that it would include such periodicals as *Pravda* and the *New York Times*. *See id.*, slip op. at 15.

**39.** Freedom of Information Act, 80 Stat. 251 (1966) (current version at 5 U.S.C. § 552(a)(4)(B) (1976)).

**40.** *Id.*

of the classification. In barring *in camera* inspection for Exemption 1 claims, the Court observed that "Congress chose to follow the Executive's determination in these matters and that choice must be honored." *Id.* at 81, 93 S.Ct. at 833.

Congress reacted swiftly to the *Mink* decision. In 1974 it amended the FOIA to provide explicitly that a court engaging in *de novo* review of agency nondisclosure "may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions[.]"[41] Congress also rewrote Exemption 1 so as to make clear that reviewing courts were charged with the responsibility of reviewing *de novo* the substantive as well as procedural propriety of the classification. The exemption now covers matters that are

> (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order.[42]

The legislative history of the 1974 Amendments to the FOIA demonstrates quite clearly that Congress sought to overrule *Mink* and facilitate *in camera* inspection of documents. In 1974 both the House and the Senate took up legislation that amended the Freedom of Information Act. In the House the Committee on Government Operations reported a bill that, among other things, would have amended the FOIA to include the language now in Section 552(a)(3)(B) of the FOIA authorizing courts to conduct *in camera* inspection.[43] It also would have rewritten Exemption 1 to cover information "authorized under criteria established by an Executive order to be kept secret in the interest of the national defense or foreign policy[.]"[44] The House passed the reported bill with only a technical amendment by a vote of 383 to 8.[45]

In the Senate the Committee on the Judiciary reported a bill with liberal language granting reviewing courts the authority to employ *in camera* inspection.[46] But bowing to pressure from the President,[47] the Committee proposed restrictive language concerning the judicial role in Exemption 1 claims: agency withholdings of documents were to be sustained unless they were without a "reasonable basis."[48] When the bill

---

**41.** 5 U.S.C. § 552(a)(4)(B) (1976).

**42.** 5 U.S.C. § 552(b)(1) (1976). Exemption 1 had previously covered matters "specifically required by Executive order to be kept secret in the interest of the national defense or foreign policy." 5 U.S.C. § 552(b)(1) (1970).

**43.** *See* H.R. 12471, § 1(d), 93d Cong., 2d Sess. (1974), U.S.Code Cong. & Admin.News 1974, p. 6267, *reprinted in* Staffs of Senate Committee on the Judiciary and House Committee on Government Operations, Freedom of Information Act and Amendments of 1974 (Pub.L. 93–502), Source Book: Legislative History, Texts, and Other Documents, at 148 (hereinafter cited as Source Book).

**44.** H.R. 12471, *supra* note 43, § 2, Source Book at 148.

**45.** *See* 120 Cong.Rec. 6819 (1974).

**46.** *See* S. 2543, § 1(b)(1), 93d Cong., 2d Sess. (1974) U.S.Code Cong. & Admin.News 1974, p. 6267, *reprinted in* 120 Cong.Rec. 17014 (1974).

**47.** *See, e. g.,* 2 Freedom of Information, Executive Privilege, Secrecy in Government: Hearings before the Subcommittee on Administrative Practice and Procedure and Separation of Powers of the Senate Committee on the Judiciary and the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 93d Cong., 1st Sess. 218–220 (1973) (testimony of Attorney General Richardson); letter from Malcolm D. Hawk, Acting Assistant Attorney General, to Hon. Chet Holifield, Chairman, House Committee on Governmental Operations, February 20, 1974, *reprinted in* Source Book, *supra* note 43, at 135–140; letter from L. Niederlehner, Acting General Counsel, Department of Defense, to Hon. Chet Holifield, February 20, 1974, *reprinted in* Source Book, *supra* note 43, at 140–144.

**48.** *See* S. 2543, *supra* note 46, § 1(b)(1), 120 Cong.Rec. at 17014. Nevertheless, the Committee made clear that it thought *in camera* inspection would be utilized in most Exemption 1 cases:

> The courts, in order to determine that the information actually is "covered" by the order or statute, will ordinarily be obliged by S. 2543 to inspect the material in question and, from such an inspection, to determine whether or not the classification was imposed by an official authorized to impose it and in

reached the Senate floor, however, Senator Muskie introduced an amendment that deleted the restrictive language.[49] After adopting Senator Muskie's amendment, the Senate overwhelmingly passed the amended version of the bill.[50]

The two versions of the 1974 Amendments both went to a Conference Committee. While the Committee was considering the legislation President Ford—who had just succeeded President Nixon—wrote to the Committee expressing his concerns about the proposed legislation.[51] In particular, the President objected that

> provisions in both bills * * * would place the burden of proof upon an agency to satisfy a court that a document classified because it concerns military or intelligence * * * secrets and diplomatic relations is, in fact, properly classified, following an in camera inspection of the document by the court. * * * [52]

President Ford indicated he could accept in the place of such provisions a provision permitting in camera inspection "only after a review of the evidence did not indicate that the matter had been reasonably classified in the interests of our national security."[53]

The Conference Committee resisted the pressure of the President and instead reported out a bill[54] that, just as the Senate and House versions had, granted reviewing courts broad discretion to employ in camera inspection. With respect to Exemption 1, the Conference Committee merged the Senate and House versions to produce the language now contained in Section 552(b)(1).

In its report the Conference Committee made explicit its desire to overrule EPA v. Mink, supra, and authorize reviewing courts to employ in camera inspection under any of the FOIA exemptions:

> The conference substitute follows the Senate amendment, providing that in determining de novo whether agency records have been properly withheld, the court may examine records in camera in making its determination under any of the nine categories of exemptions under section 552(b) of the law. In Environmental Protection Agency v. Mink, et al., 410 U.S. 73 [93 S.Ct. 827, 35 L.Ed. 119] (1973), the Supreme Court ruled that in camera inspection of documents withheld under section 552(b)(1) of the law, authorizing the withholding of classified information, would ordinarily be precluded in Freedom of Information cases, unless Congress directed otherwise. H.R. 12471 amends the present law to permit such in camera examination at the discretion of the court. While in camera examination need not be automatic, in many situations it will plainly be necessary and appropriate. Before the court orders in camera inspection, the Government should be given the opportunity to establish by means of testimony or detailed affidavits that the documents are clearly exempt from disclosure. The burden remains on the Government under this law.[55]

The bill as reported out of Conference Committee was passed overwhelmingly by

accordance with the standards set forth in the applicable executive order. Moreover, courts facing a (b)(1) exemption claim will have to decide whether or not a classification imposed some time in the past continues to be justified.
S.Rep.No. 93–854, 93d Cong., 2d Sess. 29 (1974), U.S.Code Cong. & Admin.News 1974, p. 6267, reprinted in Source Book, supra note 43, at 182.

**49.** See 120 Cong.Rec. 17022 (1974).

**50.** The vote was 64 to 17. See id. at 17047.

**51.** Letter from President Gerald R. Ford to Hon. William S. Moorhead, August 20, 1974,

reprinted in Source Book, supra note 43, at 379–380.

**52.** Id. at 379.

**53.** Id. at 380.

**54.** See H.R. 12471, 93d Cong., 2d Sess. (1974) U.S.Code Cong. & Admin.News 1974, p. 6267 (Conference version), reprinted in Source Book, supra note 43, at 219–223.

**55.** H.R.Rep.No. 93–1380, 93d Cong., 2d Sess. 8 (1974) U.S.Code Cong. & Admin.News 1974, p. 6267 (Conference Report), reprinted in Source Book, supra note 43, at 226.

both houses of Congress.[56] President Ford, however, vetoed the legislation, noting that the concerns he had earlier expressed still remained.[57] Rejecting the objections of the President, Congress overrode the presidential veto.[58]

In sum, the 1974 Amendments to the Freedom of Information Act manifest an unmistakable congressional intent to bolster the authority of reviewing courts. The active role that Congress intended the judiciary to play in enforcing the FOIA was emphasized further by amendments in 1976 that were enacted to overrule the Supreme Court decision in *FAA Administrator v. Robertson*, 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975). The case involved Exemption 3 of the FOIA, which at the time covered matters "specifically exempted from disclosure by statute." [59] In *Robertson* the Court held that this language comprehended a statute that granted a "broad degree of discretion on what information is to be protected[.]" *Id.* at 266, 95 S.Ct. at 2147. Within 15 months Congress overruled the decision by narrowing Exemption 3 to its present form.[60] The "unmistakable thrust" of the amendment was "to assure that basic policy decisions on governmental secrecy be made by the Legislative rather than the Executive branch." *American Jewish Congress v. Kreps*, 574 F.2d 624, 628 (D.C.Cir.1978) (footnote omitted). The *Robertson* amendment, like the 1974 Amendments, thus evinced a congressional intent that the *de novo* review mandated by the

Freedom of Information Act be extremely thorough so as "to insure that agencies do not impermissibly expand by unreviewed interpretations the 'particular types of matters' Congress has exempted from disclosure." *Ray v. Turner*, 587 F.2d 1187, 1221 (D.C.Cir.1978) (Wright, C. J., concurring).

■ The judicial reluctance to assume an active role in reviewing FOIA claims is reflected in both the *Mink* and *Robertson* decisions. In response Congress has plainly attempted to strengthen the *de novo* review that courts must engage in. While Congress has not mandated *in camera* inspection for any particular subset of FOIA cases, it has nevertheless made clear—by the concern reflected in the 1974 and 1976 Amendments for a thorough and meaningful *de novo* review—that in certain cases such *in camera* inspection "will plainly be necessary and appropriate." H.R.Rep.No. 93–1380, 93d Cong., 2d Sess. 8, U.S.Code Cong. & Admin.News 1974, p. 6267, *reprinted in* Source Book at 226.[61] Congress, however, never isolated those instances in which *in camera* inspection of the requested document is "plainly * * * necessary." While we in no way mean to minimize the broad discretion granted to trial courts over whether to conduct *in camera* inspection, we think it appropriate in this case to outline some of the considerations that trial courts should take into account in exercising that discretion.[62]

**56.** The vote in the House was 349 to 2. *See* 120 Cong.Rec. 34168 (1974). The Senate passed it by voice vote. *See id.* at 33300.

**57.** *See* 120 Cong.Rec. 36243–36244 (1974) (veto message of President Ford). The Conference Committee, however, had attempted to allay some of the concerns of the President by stating in its report:

[T]he conferees recognize that the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [*sic*] might occur as a result of public disclosure of a particular classified record. Accordingly, the conferees expect that Federal courts, in making *de novo* determinations in section 552(b)(1) cases under the Freedom of Information law, will accord substantial weight to

an agency's affidavit concerning the details of the classified status of the disputed record. H.R.Rep.No.93–1380, U.S.Code Cong. & Admin.News 1974, p. 6267 *supra* note 55, at 11, Source Book at 229.

**58.** The House voted 371 to 31 to override. *See* 120 Cong.Rec. 36633 (1974). The Senate voted 65 to 27 to override. *See id.* at 36882.

**59.** 5 U.S.C. § 552(b)(3) (1970).

**60.** *See* note 23 *supra.*

**61.** For the full quotation from which this statement is taken, *see* text at note 55 *supra.*

**62.** *See generally* Comment, *In Camera Inspections Under the Freedom of Information Act*, 41 U.Chi.L.Rev. 557, 562–566 (1974).

### 2. Considerations supporting in camera inspection

#### a. Judicial economy

 In conducting its *de novo* review, a trial court should first offer the agency the opportunity to demonstrate, through detailed affidavits and oral testimony, that the withheld information is clearly exempt and contains no segregable, nonexempt portions. *See EPA v. Mink, supra,* 410 U.S. at 73, 93 S.Ct. at 829. Where the agency fails to meet that burden, a not uncommon event, the court may employ a host of procedures that will provide it with sufficient information to make its *de novo* determination, including *in camera* inspection, further agency affidavits,[63] and discovery by the plaintiff.

Courts have been reluctant, however, to conduct *in camera* inspection, favoring instead the other options available. Where the examination of the requested documents requires herculean labors because of their volume, the reluctance to conduct such inspection is understandable. But when the requested documents are few in number and of short length, such reluctance frequently exacts a cost from the parties and the courts in time and money. An examination of the documents themselves in those instances will typically involve far less time than would be expended in presentation and evaluation of further evidence. The other procedures are usually nothing more than surrogates for *in camera* inspection. And, when utilization of these surrogates has not proven fruitful, the court not infrequently finds it necessary to conduct *in camera* inspection—often by direction of an appellate court after a costly appeal has been pursued by the plaintiff.

#### b. The conclusory nature of the agency affidavits

Where the agency affidavits merely parrot the language of the statute and are drawn in conclusory terms, the court's responsibility to conduct *de novo* review is frustrated. Sufficiently detailed justifications for the agency's withholding is often impossible, however, because such justifications would reveal the very information sought to be protected. In those instances, we doubt that there is any way the agency action could be sustained without *in camera* inspection. And *in camera* inspection permits the courts in such instances to fulfill their statutory obligation to conduct a meaningful *de novo* review.

#### c. Bad faith on the part of the agency

Where there is evidence of bad faith on the part of the agency, the representations of the agency lose all trustworthiness. *In camera* inspection in such situations is "plainly necessary" unless it is clear to the court that the withholding by the agency would not even be sustainable after *in camera* inspection.

#### d. Disputes concerning the contents of the document

*In camera* inspection is most helpful when the dispute over the applicability of the particular exemption centers on the actual contents of the document. On the other hand, such inspection is not appropriate when there is no dispute between the parties as to the document's contents. Interpretation of the scope of an exemption, for instance, is not made any easier by the use of *in camera* inspection.

#### e. The agency proposes in camera inspection

The reluctance of the courts to conduct *in camera* inspection is often attributable to the concern that such inspection will involve judicial intrusion into the activities of the Executive Branch through examination of information it refuses to disclose to the

---

**63.** In some cases *in camera* affidavits may be appropriate. *See Phillippi v. CIA,* 546 F.2d 1009 (D.C.Cir.1976); S.Rep.No.93–854, U.S. Code Cong. & Admin.News 1974, p. 6267, *supra* note 48, at ——, Source Book at 168. Such affidavits, however, do not permit the plaintiff to respond, and thus should be employed only where absolutely necessary. *See Ray v. Turner, supra* note 32, 587 F.2d at 1212 (Wright, C. J., concurring).

public.[64] But little basis for such concern exists when the agency itself proposes that the court conduct an *in camera* inspection of the document. In such instances, therefore, use of *in camera* inspection is more appropriate than in cases where the agency expresses its opposition to the technique.

### f. *Strong public interest in disclosure*

In cases that involve a strong public interest in disclosure there is also a greater call for *in camera* inspection.[65] The Freedom of Information Act was aimed at ending secret law and insuring that this country have "an informed, intelligent electorate[.]" H.R.Rep.No.1497, 89th Cong., 2d Sess. 12 (1966) U.S.Code Cong. & Admin. News 1966, p. 2419. When citizens request information to ascertain whether a particular agency is properly serving its public function, the agency often deems it in its best interest to stifle or inhibit the probes. It is in these instances that the judiciary plays an important role in reviewing the agency's withholding of information. But since it is in these instances that the representations of the agency are most likely to be protective and perhaps less than accurate, the need for *in camera* inspection is greater.

### C. *The Need for* In Camera *Inspection in the Instant Case*

In the instant case, an application of the foregoing considerations convinces us that *in camera* inspection of the requested document is "plainly necessary" to determine the applicability of Exemptions 1 and 3.

First, as is evident from the fact that this is the second appeal to this court, much time and money have been expended by the courts and the parties in determining the applicability of the cited exemptions to the withheld document. What is so startling, however, is that in this case the document itself is only 15 pages in length. The two affidavits by the CIA, on the other hand, total 14 pages, without even counting the attachments. If ever there was a case in which *in camera* inspection offered the most efficient technique for conducting *de novo* review, this is it.

Second, the basis on which the CIA refuses to release the undisclosed portions of the document makes *de novo* review almost impossible without *in camera* inspection. The CIA concedes that most of the document has been released in other public documents, but argues that its manner of presentation will reveal new information.[66] The CIA thus argues that to require greater specificity in its affidavits would result in disclosure of the information sought to be protected. The only way to escape this dilemma involves use of *in camera* inspection.

Third, with respect to both the Exemption 1 and the Exemption 3 claims, the contents of the requested documents are in dispute. An examination of the document would make totally unnecessary speculation and inference as to the contents of the document,[67] and firmly resolve the competing assertions made by both sides.

Fourth, the CIA has expressed its willingness for the court to conduct an *in camera* inspection of the document.[68] It is the

---

**64.** A further concern underlying the judicial reluctance is that *in camera* inspection is conducted *ex parte. See, e. g., Mead Data Central, Inc. v. U. S. Dep't of Air Force,* 566 F.2d 242, 260 (D.C.Cir.1977); *Military Audit Project v. Bush,* 418 F.Supp. 876, 878 (D.D.C.1976). The concern, however, is unfounded. Although conducted *ex parte, in camera* inspection probably increases the adversariness of an FOIA proceeding "by allowing the court to test the accuracy of the agency's representations." *Ray v. Turner, supra* note 32, 587 F.2d at 1212 (Wright, C. J., concurring).

**65.** *See* Comment, *supra* note 62, 41 U.Chi.L. Rev. at 564–566.

**66.** Brief for appellees at 20–21.

**67.** Indeed, appellant speculates in great detail as to the contents of the document. *See* brief for appellant at 14–16.

**68.** In the Supplemental Affidavit of Robert Owen, *supra* note 12, at 9, App. 94, Owen indicates that "[t]he Agency is prepared to present such additional evidence, should the Court so direct, for *ex parte, in camera* examination."

plaintiff who resists such inspection in the instant case.[69]

Finally, the plaintiff's request for the document seems in part to be motivated by a desire to determine whether the CIA has frustrated the investigation into or had a role in the assassination of President Kennedy—an event in which the public has demonstrated almost unending interest. Such an FOIA request, in an area of great public interest and that seeks to demonstrate the impropriety of the Agency's actions, makes *in camera* inspection especially appropriate.[70]

### IV. CONCLUSION

For the reasons herein stated, we reverse that portion of the judgment of the District Court holding Exemption 2 applicable to the filing and routing instructions contained in the document. Further, we vacate that portion of the judgment holding Exemptions 1 and 3 applicable to the other portions of the document, and remand for an *in camera* inspection[71] to determine the applicability of the two exemptions.

*Reversed in part, vacated in part, and remanded.*

---

69. *See* Opposition to Submission of In Camera Affidavit, *Allen v. CIA*, D.D.C. Civil Action No. 78–1743, received January 9, 1980, *reprinted at* App. 81–82.

70. In his reply brief appellant charges the CIA with bad faith in not informing the trial court that a certain regulation pertaining to classification under Executive Order 12065 had been amended. *See* reply brief for appellant at 18–19. We do not address the issue of bad faith, however, inasmuch as the other considerations by themselves demonstrate that *in camera* inspection is "plainly necessary."

71. The trial court is also free, of course, to undertake any further procedures it believes necessary, such as requiring *in camera* affidavits from the CIA, to determine the applicability of Exemptions 1 and 3 to the withheld portions of the document.