**Maryann PAISLEY, Appellant,**

v.

**CENTRAL INTELLIGENCE AGENCY et al.**

**No. 82–1799.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 2, 1983.

Decided July 22, 1983.

Eric R. Glitzenstein, with whom Alan B. Morrison and Cornish F. Hitchcock, Washington, D.C., were on brief, for appellant. Katherine A. Meyer, Washington, D.C., entered an appearance for appellant.

Michael J. Ryan, Asst. U.S. Atty., with whom Stanley S. Harris, U.S. Atty., and Royce C. Lamberth, John O. Birch, and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on brief, for appellees.

Before WRIGHT and WILKEY, Circuit Judges, and BONSAL,* Senior District Judge.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

■ In this action arising under the Freedom of Information Act (FOIA or Act),[1] appellant Maryann Paisley seeks information from the Central Intelligence Agency (CIA) and the Federal Bureau of Investigation (FBI) concerning the 1978 shooting death of her husband, a former CIA official. These agencies refuse to release 58 documents that are responsive to appellant's request, on grounds that the documents constitute congressional records not subject to FOIA[2] or, alternatively, that they are protected from disclosure by Exemption 5 of the Act.[3] Additionally, the CIA claims that certain documents must also be withheld pursuant to Exemptions 1[4] and 3[5] of FOIA. The District Court granted partial summary judgment in favor of the CIA and the FBI, finding that release of these disputed documents was barred by the Speech or Debate Clause of the Constitution,[6] as well as by the Act's Exemption 5.

---

* Of the United States District Court for the Southern District of New York, sitting by designation pursuant to 28 U.S.C. § 294(d) (Supp. V 1981).

1. 5 U.S.C. § 552 (1982).

2. The Act requires that an agency make "agency records" available to the public upon reasonable request. See 5 U.S.C. § 552(a)(3) & (4)(B). Since Congress is not an "agency" for purposes of that provision, see 5 U.S.C. § 551(1)(A) (1982), documents within congressional control are not subject to FOIA requests. See Goland v. CIA, 607 F.2d 339 (D.C.Cir.1978), vacated in part on other grounds, 607 F.2d 367 (D.C.Cir.1979), cert. denied, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). See generally pp. 692–696 infra.

3. 5 U.S.C. § 552(b)(5). Exemption 5 shields from mandatory disclosure "inter-agency or in-

tra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency[.]"

4. 5 U.S.C. § 552(b)(1). Exemption 1 covers matters that are authorized by Executive Order to be kept secret in the interest of national defense or foreign policy and that have, in fact, been properly classified. For the full text of Exemption 1, see note 58 infra.

5. 5 U.S.C. § 552(b)(3). Exemption 3 protects from required disclosure matters that are "specifically exempted from disclosure by statute[.]" For the full text of Exemption 3, see note 59 infra.

6. The Speech or Debate Clause of the Constitution provides that "for any Speech or Debate in either House, they [members of Congress] shall

Because the Speech or Debate Clause is inapposite to this case and more thorough consideration of the applicability of various FOIA exemptions to these agency records is necessary, we reverse and remand this case to the District Court for further proceedings in accordance with this opinion.

## I. BACKGROUND

On September 24, 1978 John A. Paisley set sail on the Chesapeake Bay, alone in his sloop, the "Brillig." The next day the pilotless sloop was found aground on the Bay shore. One week later a body was discovered in the Bay with weighted diver's belts about the waist and chest and with a gunshot wound to the head. The body was subsequently identified as that of John Paisley.

Paisley had worked for the CIA from 1963 to 1974, eventually becoming the agency's Deputy Director of Strategic Research. From 1974 until his death in 1978 Paisley had served as a part-time consultant for the agency. The mysterious circumstances of his death generated considerable media speculation[7] and prompted the Senate Select Committee on Intelligence (SSCI or Committee) to initiate its own factfinding inquiry. The Committee asked the FBI to gather and assess the available evidence concerning Paisley's death. Upon receipt of the FBI's report on April 18, 1979, the Committee issued a press release stating that it would be making some additional limited inquiries and would then release a full report.[8] No report has ever been made public.

On April 18, 1979 appellant Maryann Paisley sent identical letters to the CIA, the FBI, and the Department of Defense (DOD), requesting, pursuant to the Act, "any and all records in whatever form and wherever situate with respect to her husband, John A. Paisley."[9] During that year the CIA released 292 documents in partial response to her FOIA request. The FBI, however, refused to expedite processing of her request and furnished no information whatever.

Dissatisfied, appellant filed this action against the CIA, the FBI, and the DOD on January 7, 1980. Appellant asked the District Court to order defendants to produce all responsive, nonexempt documents in their possession. Subsequently, the parties entered into a number of stipulations, agreeing: (1) to dismiss DOD from the case inasmuch as it possessed no records responsive to appellant's request; (2) that 752 CIA documents responsive to her request were no longer at issue; and (3) that 66 FBI documents responsive to her request were no longer at issue.

On September 25, 1980 the FBI filed affidavits by Special Agents Richard A. McCauley and Thomas L. Wiseman, releasing certain requested documents but withholding parts thereof or other entire documents pursuant to numerous FOIA exemptions[10] and because some were not "agency records." The FBI also noted that a number of responsive documents had been referred to the Coast Guard, the CIA, and the Department of Justice (DOJ), as the originating agencies, for direct response to the FOIA request. On June 18, 1981 CIA officials Harry E. Fitzwater, Louis J. Dube, and Paul L. Marr filed similar affidavits, releasing some documents in their entirety and others only in part. They likewise jus-

---

not be questioned in any other Place." U.S. Const. Art. I, § 6, cl. 1.

7. One lengthy and probing article appeared in the New York Times Sunday Magazine. *See* Szulc, *The Missing C.I.A. Man,* N.Y. Times, Jan. 7, 1979 (Magazine), at 13. *See also The Puzzling Paisley Case,* TIME, Jan. 22, 1979, at 30.

8. *See Statement Issued by Senate Select Committee on Intelligence at 1200 Hours, Wednesday, 18 April 1979,* Joint Appendix (JA) at 166.

9. *See* Complaint for Declaratory and Injunctive Relief in *Paisley v. CIA,* D.D.C. Civil Action No. 80–0038, filed May 13, 1982, at 2 & Exhibit A, reprinted at JA 6, 37.

10. The FBI withheld material pursuant to FOIA Exemptions 1, 2, 3, 5, 7(C), and 7(D), 5 U.S.C. § 552(b)(1), (2), (3), (5), (7)(C), & 7(D).

tified the withholding of other documents and the deletions under various exemptions [11] and because certain records in the CIA's possession were not deemed "agency records."

On July 23, 1981 the agencies moved for summary judgment. Appellant filed an opposition coupled with a motion to require the CIA and the FBI to prepare supplemental indices of the withheld documents in accordance with the standard set forth in *Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir. 1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974).[12] On October 20 the District Court ordered appellees to provide more information as to the documents referred to other agencies, and to prepare supplemental *Vaughn* indices for the documents withheld as congressional, and not agency, records.

The CIA submitted the affidavit of J. William Doswell, describing the 57 documents withheld as congressional records. These documents fall into three distinct categories: (1) CIA phone log entries summarizing conversations between the agency and the SSCI; (2) agency memoranda detailing meetings between CIA personnel and the SSCI and its staff; and (3) requests for information made by the SSCI and the CIA's responses to those requests.[13] If not claimed to be congressional records, all documents were additionally described as exempt intra-agency memoranda pursuant to

Exemption 5; 28 of the documents were also claimed as exempt due to security classification under Exemptions 1 and 3.

The FBI responded to the District Court's request for further information by submitting the affidavit of Special Agent Sherry L. Davis with a supplemental index identifying eleven documents as congressional records not subject to FOIA or, alternatively, as protected by Exemption 5. All but one of the eleven documents had been received from the SSCI, and seven had been classified as "Secret" by the SSCI. *See* Davis Affidavit at 6–8, JA 119–121. The FBI's submission also explained that the Department of Justice would respond directly to appellant concerning the three responsive documents referred by the FBI to the Department.[14]

On May 13, 1982 the District Court *sua sponte* dismissed appellant's complaint as to the three FBI documents referred to the Department of Justice, claiming that it lacked jurisdiction over these documents because DOJ was not formally party to the suit. Memorandum of the District Court in *Paisley v. CIA,* D.D.C. Civil Action No. 80–0038, filed May 13, 1982 (hereinafter Dist. Ct.Op.), at 4, JA 155. The District Court then granted partial summary judgment for the agencies. However, it did order the CIA to release one document to appel-

---

**11.** The CIA withheld material pursuant to FOIA Exemptions 1, 2, 3, 5, and 6, 5 U.S.C. § 552(b)(1), (2), (3), (5), & (6).

**12.** The requirement of a *"Vaughn* index" serves to facilitate court review of an agency's FOIA responses by making clear the various grounds for any refusal to release responsive information. The index consists of one document that adequately describes each withheld record or deletion and sets forth the exemption claimed and why that exemption is relevant. *See Founding Church of Scientology v. Bell,* 603 F.2d 945, 949 (D.C.Cir.1979) *(per curiam); Mead Data Central, Inc. v. U.S. Dep't of Air Force,* 566 F.2d 242, 251 (D.C.Cir.1977) (the agency "must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply").

**13.** These CIA documents are individually identified and more thoroughly described in the Doswell Affidavit at 9–27, JA 132–150. *See also* Memorandum of the District Court in *Paisley v. CIA,* D.D.C. Civil Action No. 80–0038, filed May 13, 1982 (hereinafter Dist.Ct.Op.) at 9 n. 14, JA 160.

**14.** Appellees later filed with the District Court several letters from SSCI indicating the Committee's understanding that, in general, documents generated by SSCI or those generated by an agency at SSCI's request were congressional documents and exempt from FOIA. More specifically, the Committee noted its understanding that, in the instant case, SSCI believed that the documents generated by the Committee or by the agency at SSCI request were congressional documents and would not be released without prior Committee approval.

lant—a SSCI press release.[15] Seven of the FBI documents were found to be congressional documents because the District Court determined that the Committee maintained control over them. *Id.* at 4–6, JA 155–157. The other four FBI documents [16] and the remaining 55 CIA documents [17] were found to be not subject to Committee control and so were agency records within FOIA coverage. *Id.* at 6–8, JA 157–159. However, the District Court determined that all 59 documents could be withheld in their entirety under the Speech or Debate Clause of the Constitution and under Exemption 5 of the Act. *Id.* at 7–11, JA 158–162.

## II. JURISDICTION OVER DOJ DOCUMENTS

Appellant's first allegation of error is that the District Court improperly held that it lacked jurisdiction over five FBI documents [18] that had originated with DOJ and that the FBI had then referred back to DOJ for direct response to appellant's FOIA request. The lower court *sua sponte* dismissed the complaint with respect to these documents on the theory that appellant's "proper recourse" would be against DOJ itself, an agency not a party to this litigation.[19] In so doing, the District Court followed the reasoning of a prior District Court opinion, *McGehee v. CIA,* 533 F.Supp. 861, 868–869 (D.D.C.1982), *rev'd,* 697 F.2d 1095 (D.C.Cir.1983),[20] which held that an agency could properly refer documents responsive to FOIA requests to the agency that created the documents in the first place, especially if those documents were classified or contained sensitive information.

The District Court's decision in *McGehee,* however, is no longer good law. This court has since reversed that lower court holding, resolving the basic jurisdictional issue common to both cases. In *McGehee v. CIA* we plainly held that "when an agency receives a FOIA request for 'agency records' in its possession, it must take responsibility for processing the request. It cannot simply refuse to act on the ground that the documents originated elsewhere." 697 F.2d 1095, 1110 (D.C.Cir.1983). A District Court with jurisdiction of the agency possessing the disputed documents will therefore have jurisdiction to resolve the status of those documents, no matter what their origin.

In light of our *McGehee* decision, we must reverse the District Court's dismissal in this case of the five FBI documents referred to DOJ. We remand so that the FBI may present an updated justification for withholding all or part of those documents.[21] Moreover, to foreclose the possibility of further unnecessary delay in this case,[22] we direct the FBI to file the appropriate affidavit within 30 days after issuance of the mandate. If the agency cannot show that any FOIA exemption proper-

---

**15.** This CIA document, identified as OLC No. 54, was a copy of the Committee's own press release of April 18, 1979, referred to at note 8 *supra.* The District Court also noted that another of the CIA documents, OLC No. 49, had already been released to appellant. *See* Dist. Ct.Op. at 9 n. 14, JA 160; Doswell Affidavit at 24, JA 147.

**16.** These FBI documents were identified in the Davis Affidavit as Nos. 26, 27, 28, and 119.

**17.** These CIA documents were identified in the Doswell Affidavit as OLC Nos. 1–48, 50–53, and 55–57.

**18.** The five FBI documents are identified as Nos. 40, 46, 49, 50, and 59 in the Davis Affidavit. Three of the documents—Nos. 40, 49, and 50—are apparently identical. *See* Davis Affidavit at 4–5, JA 117–118.

**19.** Dist.Ct.Op. at 4, JA 155.

**20.** The District Court also relied on a similar holding in *British Airports Authority v. CAB,* 531 F.Supp. 408, 417–418 (D.D.C.1982).

**21.** Appellees have not opposed a remand limited to this purpose. *See* brief for appellees at 1 n. 1.

**22.** Appellant made her initial FOIA request to the FBI in April 1979. She was not informed for 18 months that any documents had been referred to the Department of Justice (DOJ) for processing. The record indicates that DOJ has yet to contact appellant as to these referred documents, despite the FBI's December 1981 assertion that the documents would be processed in "the near future." *See* Davis Affidavit at 5, JA 118.

ly applies, the District Court should order release of these documents.

### III. FOIA ANALYSIS

#### A. Agency Records Issue

Next, we must consider appellees' contention that, despite the lower court's ruling to the contrary, all documents in this case are congressional—not agency—records and are therefore not subject to FOIA. The Government argues that these documents should be considered as congressional records because they disclose the deliberative process of the SSCI and would not exist in this form but for the congressional investigation that sparked their creation.[23] We do not agree.

#### 1. Legal standard.

The only documents still in dispute are three held by the FBI[24] and 55 in the possession of the CIA.[25] Under 5 U.S.C. § 552(a)(4)(B), this court's power to order their release is dependent upon a showing that the agencies have (1) "improperly" (2) "withheld" (3) "agency records." See Kissinger v. Reporters Committee for Freedom of the Press, 445 U.S. 136, 150, 100 S.Ct. 960, 968, 63 L.Ed.2d 267 (1980); McGehee v. CIA, supra, 697 F.2d at 1105. The only threshold question posed here is whether the disputed documents can be considered "agency records." Neither the Act nor its legislative history provides any adequate definition of this key phrase. See, e.g., Forsham v. Harris, 445 U.S. 169, 183–184,

100 S.Ct. 978, 985–986, 63 L.Ed.2d 293 (1980).[26] Accordingly, we turn to existing case law—as informed by the general policies of the Act—for guidance on this issue.

█ In recent years this court has followed the standards set forth in Goland v. CIA, 607 F.2d 339 (D.C.Cir.1978), vacated in part on other grounds, 607 F.2d 367 (D.C.Cir.1979), cert. denied, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980), for determining under what conditions documents in the possession of an agency may nonetheless be congressional documents, as opposed to agency records, and so be exempt from disclosure under FOIA:

> Whether a congressionally generated document has become an agency record * * depends on whether under all the facts of the case the document has passed from the control of Congress and become property subject to the free disposition of the agency with which the document resides.

607 F.2d at 347. Two factors are considered dispositive of Congress' continuing intent to control a document: (1) the circumstances attending the document's creation, and (2) the conditions under which it was transferred to the agency. See Holy Spirit Ass'n for Unification of World Christianity v. CIA, 636 F.2d 838, 841 (D.C.Cir. 1980), other portions of decision vacated and remanded as moot, 455 U.S. 997, 102 S.Ct. 1626, 71 L.Ed.2d 858 (1982). See also Ryan v. Dep't of Justice, 617 F.2d 781, 785 (D.C.Cir.1980); Goland v. CIA, supra, 607 F.2d at 347–348. In the absence of any

---

**23.** In a supplemental brief the Government informed the court that its original position on the agency records issue was inconsistent with the position subsequently taken by the FBI in another proceeding, Allen v. FBI, D.D.C. Civil Action No. 81–1206 (Nov. 24, 1982). The Government then attempted to "adjust" its original argument, offered new evidence as to a pre-existing agreement on confidentiality between Congress and the CIA, and suggested that the entire question of agency records be remanded to the District Court to allow Congress, if interested, to brief the issue itself. We believe that the parties now before the court have provided both the adequate record and full argumentation necessary for a proper resolution of the agency records issue.

**24.** At oral argument counsel for appellant informed the court that FBI Document No. 28 has since been obtained. This document is an 18-page booklet that was evidently printed by the SSCI and intended for public consumption.

**25.** Not included in this total for the CIA's documents are OLC No. 54, which was released pursuant to the District Court's order, and OLC No. 49, which has already been released to appellant according to the CIA and the District Court. See note 15 supra.

**26.** See generally McGehee v. CIA, 697 F.2d 1095, 1106 (D.C.Cir.1983); Note, The Definition of "Agency Records" Under the Freedom of Information Act, 31 STAN L.REV. 1093 (1979).

manifest indications that Congress intended to exert control over documents in an agency's possession, the court will conclude that such documents are not congressional records.

While the Supreme Court has never directly commented on the *Goland* approach, a recent decision has shed some new light—and confusion—on what may constitute "agency records" for the purposes of FOIA. In *Kissinger v. Reporters Committee for Freedom of the Press, supra,* the Court held, *inter alia,* that transcripts of telephone conversations made during Henry Kissinger's tenure as National Security Adviser to the President were not "agency records" even though they had been removed from White House files and transferred to Kissinger's new office at the Department of State.[27] Rejecting the argument that physical location alone should control the question,[28] the Court instead looked beyond mere possession of the documents to the *control* exercised by the State Department:

> The papers were not in the control of the State Department at any time. They were not generated in the State Depart-

ment. They never entered the State Department's files, and they were not used by the Department for any purpose. * *

445 U.S. at 157, 100 S.Ct. at 972.

*Kissinger*'s focus on the control exercised by the possessor agency is not incompatible with *Goland*'s focus on Congress' intent to control.[29] Certainly, the two approaches differ somewhat in that one emphasizes factors relating to the absence of control by the *possessor,* while the other stresses the manifestations by the *creator* of an intent to control. *See McGehee v. CIA, supra,* 697 F.2d at 1107 n. 52. Yet, the cases fit together in standing for the general proposition that the agency to whom the FOIA request is directed must have exclusive control of the disputed documents. If, under the *Goland* standard, Congress[30] has manifested its own intent to retain control, then the agency—by definition—cannot lawfully "control" the documents within the meaning of *Kissinger,* and hence they are not "agency records."[31] Thus we hold that our *Goland* approach has survived and is consistent with the *Kissinger* decision. We

**27.** Had these documents remained at the White House, they would be exempt from FOIA since the Act's legislative history makes clear that the term "agency" does not include "the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President * * *." *Kissinger v. Reporters Committee for Freedom of the Press,* 445 U.S. 136, 156, 100 S.Ct. 960, 971, 63 L.Ed.2d 267 (1980).

**28.** As the Court reasoned, "If mere physical location of papers and materials could confer status as an 'agency record' Kissinger's personal books, speeches, and all other memorabilia stored in his office would have been agency records subject to disclosure under the FOIA," 445 U.S. at 157, 100 S.Ct. at 972. *See also Forsham v. Harris,* 445 U.S. 169, 185 n. 16, 100 S.Ct. 978, 987 n. 16, 63 L.Ed.2d 293 (1980) ("We certainly do not indicate, however, that physical possession or initial creation is by itself always sufficient."); *Goland v. CIA, supra* note 2, 607 F.2d at 346.

**29.** In an earlier case this court noted that the *Kissinger* decision used language that implicitly suggested approval of the *Goland* approach. *Carson v. U.S. Dep't of Justice,* 631 F.2d 1008, 1011 (D.C.Cir.1980).

**30.** We express no view here on whether a different analysis would be warranted were the creating body other than Congress. We do note, however, that *Goland*'s explicit focus on Congress' intent to control (and not on the agency's) reflects those special policy considerations which counsel in favor of according due deference to Congress' affirmatively expressed intent to control its own documents. By first directing our inquiry into Congress' intentions as to the status and disposition of disputed documents, we thereby safeguard Congress' long-recognized prerogative to maintain the confidentiality of its own records as well as its vital function as overseer of the Executive Branch, *see McGehee v. CIA, supra* note 26, 697 F.2d at 1107–1108; *Goland v. CIA, supra* note 2, 607 F.2d at 348 n. 48.

**31.** *See generally* Comment, *Administrative Law—Freedom of Information Act—Agency Records,* 27 N.Y.L.Sch.L.Rev. 636, 648–654 (1981); *Developments Under the Freedom of Information Act—1980,* 1981 Duke L.J. 338, 349–352; *The Supreme Court, 1979 Term,* 94 Harv.L.Rev. 75, 232–242 (1980).

turn now to apply the *Goland* standard to the case at bar.

## 2. *Application of standard.*

The documents in dispute in this case can be divided into two categories—those that Congress created and those that the CIA created. All documents are now in the possession of either the FBI or the CIA.

### a. *Records created by Congress.*

■ From the record it appears that the SSCI itself generated only five of the disputed documents—all three of the FBI records and two of the CIA documents.[32] Applying the two-pronged *Goland* test, we find that neither the circumstances surrounding the creation of the documents nor the conditions under which they were transferred to the agencies manifests a clear congressional intent to maintain control.

When Congress created the five documents in this case, it affixed no external indicia of control or confidentiality on the faces of the documents.[33] That the SSCI knew quite well how to classify its documents as secret is most clear from the fact that the Committee so stamped at least seven *other* of its documents related to the Paisley investigation—documents which

were later requested by appellant, but which were properly held by the District Court to be exempt congressional documents in light of their classification markings.[34] Furthermore, the Government has not shown that the hearings which resulted in the three transcripts of testimony were conducted under any special conditions of secrecy.[35]

Similarly, the documents at issue were not subsequently sent to the FBI and the CIA in such a way as to manifest any intent by Congress to retain control. The Government points to no *contemporaneous* and *specific* instructions from the SSCI to the agencies limiting either the use or disclosure of the documents.[36] Instead, the Government seeks to rely on an exchange of correspondence between the SSCI and the CIA as proof of the existence of a "pre-existing agreement" that any and all documents exchanged between the CIA and the SSCI would require review and approval by the Committee prior to public disclosure.[37] We do not consider these six letters to constitute sufficient evidence of Congress' intent to retain control over these particular documents.

The only two letters that specifically refer to the Paisley investigation were writ-

---

**32.** FBI Documents Nos. 26 and 27 are transcripts of police and Coast Guard officials' testimony given before the Committee. No. 119 is a letter from the chairman of the SSCI to Senator Roth, advising him that a report will be submitted on conclusion of the Paisley inquiry. *See* Davis Affidavit at 6–7, JA 119–120. The two CIA documents are both letters. One, from the chairman of the SSCI to the Attorney General, points out the "troubling questions" still unanswered in the Paisley case and requests the FBI to review the available information. The other letter, also from the SSCI chairman, is to Senator Roth advising him that he will receive a full report upon conclusion of the investigation. *See* Doswell Affidavit at 22, JA 145.

**33.** By contrast, in *Goland v. CIA, supra* note 2, the hearing transcript at issue was clearly marked "Secret" when created by Congress and was thus held to be within continuing congressional control. *See* 607 F.2d at 347.

**34.** Appellant has not appealed from the determination that these seven documents were not

agency records subject to free disposition by the FBI.

**35.** Again, this contrasts with the factual situation in *Goland* where the hearings were held in strict secrecy with typist and stenographer sworn to secrecy. *See* 607 F.2d at 347.

**36.** In *Holy Spirit Ass'n for Unification of World Christianity v. CIA*, 636 F.2d 838 (D.C.Cir. 1980), *other portions of decision vacated and remanded as moot*, 455 U.S. 997, 102 S.Ct. 1626, 71 L.Ed.2d 858 (1982), the court pointed to the sealed cartons of and detailed memoranda accompanying the congressional documents transferred to the CIA. 636 F.2d at 842. Those conditions of transfer clearly indicated a congressional intent to retain control of the documents.

**37.** Copies of these letters were submitted to the court in a later supplemental brief as "recently discovered" information. *See* supplemental brief for appellees (appendix).

ten in 1981 by the FBI and the CIA to the SSCI and simply indicate the *agencies'* belief that the documents now at issue are congressional in nature. There is no response from the Committee. Such one-sided correspondence initiated long after the original creation and transfer of the documents simply constitutes *post hoc* rationalization by the agencies. *Cf. Holy Spirit Ass'n for Unification of World Christianity v. CIA, supra,* 636 F.2d at 842 (letter from Clerk of House of Representatives written after transfer of records does not establish congressional control).

The remaining letters, written during 1978–82, do indicate the Committee's desire to prevent release without its approval of any documents generated by the Committee or by an intelligence agency in response to a Committee inquiry.[38] However, there is no discussion of any particular documents or of any particular criteria by which to evaluate and limit the breadth of this interdiction. We thus find these letters too general and sweeping to provide sufficient proof, when standing alone, of a specific intent to transfer these five Paisley documents to the FBI and the CIA for a "limited purpose and on condition of secrecy." *Goland v. CIA, supra,* 607 F.2d at 348 n. 48.[39] In sum, nothing in either the circumstances of the documents' creation or the conditions attending their transfer provides the requisite express indication of a congressional intent to maintain exclusive control over these particular records.

**38.** One letter in particular, written on September 22, 1982 by the chairman of the SSCI to the CIA Director, explicitly spells out the Committee's desire that all such documents constitute congressional documents and *not* agency records within the meaning of 5 U.S.C. § 552(a)(4)(B) & (C).

**39.** *See also Holy Spirit Ass'n for Unification of World Christianity v. CIA, supra* note 36, 636 F.2d at 842; text at notes 12–13 *supra.* Furthermore, this "understanding" is documented only as between the SSCI and the CIA. No evidence was offered as to the existence of a similar accord between the SSCI and the FBI.

**40.** *See generally* Doswell Affidavit at 9–27, JA 132–150.

b. *Records created by the CIA.*

The vast majority of the documents now in the CIA's possession were not even congressionally generated. Most are internal agency memoranda about the Paisley investigation and notations of meetings or phone calls between CIA and SSCI personnel or among CIA personnel alone. In fact, many of the "documents" are actually just brief entries made by CIA employees in a journal kept by the agency's Office of Legislative Counsel to record all communications with the Legislative Branch.[40] The Government argues that these records, although created by the CIA, should nevertheless be considered congressional records because they were generated in direct response to the SSCI's own investigation. On this view, but for Congress' independent inquiry into Paisley's death, these documents would not exist.

▪ This contention is untenable. First and foremost, these documents were not created by Congress and were never even in Congress' possession. While initial creation or mere possession of a document is not alone dispositive of the issue of control, *see, e.g., Forsham v. Harris, supra,* 445 U.S. at 185 n. 16, 100 S.Ct. at 987 n. 16, both are certainly highly relevant to the inquiry. When Congress did not actually create and did not ever physically possess certain documents, it is difficult to imagine how such documents could be deemed within congressional control.[41]

The only asserted connection of these documents to Congress[42] is that they are

**41.** This is not to imply that agency-created documents can never become congressional, whether by eventual transfer to Congress or by some other means. *See Holy Spirit Ass'n for Unification of World Christianity v. CIA, supra* note 36, 636 F.2d at 843.

**42.** The Government also relies on the "pre-existing agreement" reached between the CIA and the SSCI to the effect that all CIA created documents related in any way to a congressional inquiry would be congressional records for FOIA purposes. This argument was discussed and rejected *supra* at pp. 694–695.

intimately related to a congressional investigation and may well have not been created but for Congress' investigation of the Paisley death. That connection is far too insubstantial and commonplace to establish congressional control within the meaning of *Goland.* To hold otherwise would be to exempt from FOIA's purview a broad array of materials otherwise clearly categorizable as agency records,[43] thereby undermining the spirit of broad disclosure that animates the Act. *See, e.g., Dep't of the Air Force v. Rose,* 425 U.S. 352, 360–362, 96 S.Ct. 1592, 1598–1599, 48 L.Ed.2d 11 (1976); *EPA v. Mink,* 410 U.S. 73, 80, 93 S.Ct. 827, 832, 35 L.Ed.2d 119 (1973).[44] Many agencies, not simply the intelligence community, must work frequently and closely with congressional committees on matters of budget and policy or on individual cases. We decline to hold, in the absence of some stronger indicia of congressional intent, that all documents so generated in this or similar "joint" congressional and agency investigations constitute records within Congress' exclusive control. We therefore affirm the District Court's ruling that, on the basis of all the facts of this case, the FBI and CIA documents are agency records for the purpose of appellant's FOIA request.

### B. *Applicability of Speech or Debate Clause*

After finding correctly that these documents were agency records, the lower court went on to hold that their release to appellant must still be barred by the Speech or Debate Clause of the Constitution.[45] Article I, § 6, cl. 1 of the Constitution provides. that "for any Speech or Debate in either House, they [senators and representatives] shall not be questioned in any other Place." According to the District Court, release of these documents—intimately related to a congressional investigation—would interfere with the integrity of the Senate's ability to oversee the intelligence activities of the CIA and the FBI. Since the Speech or Debate Clause has been read generally to protect the legislative process, the District Court determined that "the kind of mischief that would arise from release of these documents is precisely the kind of evil that the Speech or Debate Clause is intended to prevent."[46] We find that this application of the Speech or Debate Clause is inapposite; the Clause and its policies, as interpreted by this court and the Supreme Court, simply have no bearing on this case.

■ It is true that the fundamental purpose of the Clause is to "protect the integrity of the legislative process," *United States v. Brewster,* 408 U.S. 501, 507, 92 S.Ct. 2531, 2535, 33 L.Ed.2d 507 (1972). This is primarily accomplished by safeguarding the independence of individual legislators—by ensuring that the legislators are not "distracted from or hindered in the performance of their legislative tasks by being called into court to defend their actions."[47] Yet, while

---

**43.** We note that, in the absence of some assertion of congressional control, there would be no question but that these documents were agency records. They are, for the most part, internal agency notations and memoranda, created by the CIA and kept in its files to serve the security, information, and communications purposes of the agency. *See Kissinger v. Reporters Committee for Freedom of the Press, supra* note 27, 445 U.S. at 157, 100 S.Ct. at 972.

**44.** *But see Navasky v. CIA,* 499 F.Supp. 269, 278 (S.D.N.Y.1980) (holding that documents generated by the CIA at the specific request of Congress were exempt from disclosure as congressional records).

**45.** The District Court raised this issue *sua sponte,* with neither of the parties briefing the question. We note at this point that the

Government no longer supports the disposition on these grounds as it has taken a contrary position on the issue in an analogous case. Instead, the Government requests that we remand the issue so that the Legislative Branch may, if it desires, argue the issue before the District Court. *See* supplemental brief for appellees at 5. Since the issue has nonetheless been fully briefed on appeal, we will proceed to dispose of the argument.

**46.** Dist.Ct.Op. at 10, JA 161 (footnote omitted).

**47.** *Powell v. McCormack,* 395 U.S. 486, 505, 89 S.Ct. 1944, 1955, 23 L.Ed.2d 491 (1969). *See Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 503, 95 S.Ct. 1813, 1821, 44 L.Ed.2d 324 (1975); *United States v. Johnson,* 383 U.S. 169, 180–181, 86 S.Ct. 749, 755–756, 15 L.Ed.2d 681 (1966) (the Clause "prevent[s]

the policies behind the Clause are quite general, actual application of the Clause to bar judicial proceedings has been strictly limited.[48] The core protection afforded by the Clause is to preclude those civil or criminal suits that seek to hold individual legislators (or their aides) liable for their legislative activities.[49] *See, e.g., Doe v. McMillan,* 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); *Gravel v. United States,* 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972). The Clause has also been interpreted to bar a second type of suit—one that would directly interfere with the legislative process by "interfer[ing] with an ongoing activity by Congress." *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 510 n. 16, 95 S.Ct. 1813, 1824 n. 16, 44 L.Ed.2d 324 (1975); *see also Exxon Corp. v. FTC,* 589 F.2d 582 (D.C.Cir.1978).

Neither situation exists in this case. This suit involves no individual member of Congress or legislative aide; it thus falls outside the fundamental protection of the Clause. Nor does this action threaten to interfere with ongoing legislative activity. The Paisley investigation ground to a halt years ago; the legislative process has effectively terminated. This court is not even being asked to scrutinize Congress' actions or decisions.[50] Appellant merely seeks disclosure of certain documents prepared in conjunction with a congressional investigation long since concluded.[51] As this court has recently held, FOIA's requirements and exemptions must be taken to be "the definitive word on disclosure of the information in the Government's possession covered by it." *Washington Post Co. v. U.S. Dep't of State,* 685 F.2d 698, 704 (D.C.Cir.1982).

### C. *Exemptions*

#### 1. *Exemption 5.*

Accordingly, we now examine whether Exemption 5 should bar disclosure to appellant of the disputed documents. This section of FOIA shields from mandatory disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency[.]" 5 U.S.C. § 552(b)(5). The courts have long recognized that this exemption clearly protects those materials that fall within the Government's "deliberative process" privilege.[52] This privilege serves the primary

intimidation [of legislators] by the executive * * * before a possibly hostile judiciary").

**48.** As the Supreme Court has reiterated, the Speech or Debate Clause is subject to strict "finite limits." *Doe v. McMillan,* 412 U.S. 306, 317, 93 S.Ct. 2018, 2027, 36 L.Ed.2d 912 (1973); *see McSurely v. McClellan,* 553 F.2d 1277, 1285 (D.C.Cir.1976) *(en banc) (per curiam). See generally* Reinstein & Silverglate, *Legislative Privilege and the Separation of Powers,* 86 Harv.L.Rev. 1113 (1973) (arguing in favor of broader protection in criminal proceedings); Bradley, *The Speech or Debate Clause: Bastion of Congressional Independence or Haven for Corruption?,* 57 N.C.L.Rev. 197 (1979) (courts have taken too broad a view of Clause).

**49.** In a case involving a Justice Department challenge to a subpoena issued by a House subcommittee, this court summarized existing precedent on the Speech or Debate Clause:

What the cases establish is that the immunity from judicial inquiry afforded by the Speech or Debate Clause is personal to members of Congress. Where they are not harassed by personal suit against them, the clause cannot be invoked to immunize the congressional subpoena from judicial scrutiny.

*United States v. American Telephone & Telegraph Co.,* 567 F.2d 121, 130 (D.C.Cir.1977).

**50.** Even if this suit *did* present a direct challenge to the congressional investigation into Paisley's death (which it does not), that fact alone would not shield Congress' action from judicial scrutiny: "the Clause does not and was not intended to immunize congressional investigatory actions from judicial review. Congress' investigatory power is not, itself, absolute." *United States v. American Telephone & Telegraph Co., supra* note 49, 567 F.2d at 129.

**51.** As several courts have emphasized, the Speech or Debate Clause is designed to protect against direct interference with the activities of legislators; it is not intended to protect the mere confidentiality of their materials. *See In re Grand Jury Investigation,* 587 F.2d 589, 596 (3d Cir.1978); *In re Possible Violations of 18 U.S.C. §§ 201, 371,* 491 F.Supp. 211 (D.D.C. 1980).

**52.** *See, e.g., EPA v. Mink,* 410 U.S. 73, 85–90, 93 S.Ct. 827, 835–837, 35 L.Ed.2d 119 (1973); *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 862, 866–869 (D.C.Cir.1980); *Vaughn v. Rosen,* 523 F.2d 1136 (D.C.Cir.1975).

purpose of permitting agency decisionmakers to engage in that frank exchange of opinions and recommendations necessary to the formulation of policy without being inhibited by fear of later public disclosure. *See Jordan v. U.S. Dep't of Justice,* 591 F.2d 753, 772–774 (D.C.Cir.1978) (*en banc*); S.Rep. No. 813, 89th Cong., 1st Sess. 9 (1965).

■■■ To be protected by Exemption 5's deliberative process privilege, documents must meet two requirements. First, the documents must be "pre-decisional," *i.e.,* they must be generated "antecedent to the adoption of agency policy." *Jordan v. U.S. Dep't of Justice, supra,* 591 F.2d at 774. If there is no definable decisionmaking process that results in a final agency decision, then the documents are not pre-decisional. *See Vaughn v. Rosen,* 523 F.2d 1136, 1146 (D.C. Cir.1975). Second, the documents must be "deliberative" in nature, reflecting the "give-and-take" of the deliberative process and containing opinions, recommendations, or advice about agency policies. *See Arthur Andersen & Co. v. IRS,* 679 F.2d 254, 257 (D.C.Cir.1982); *Jordan v. U.S. Dep't of Justice, supra,* 591 F.2d at 774. Factual material that does not reveal the deliberative process is not protected by this exemption. *See EPA v. Mink, supra,* 410 U.S. at 89–91, 93 S.Ct. at 837–838.

■■■ The District Court held all of the disputed documents to be exempt from disclosure under Exemption 5 because they were generated as part of a joint congressional and agency investigation and were therefore "pre-decisional and confidential." *See* Dist.Ct.Op. at 7, JA 158. This cursory explanation simply does not suffice to support the lower court's decision. Nor does the record on appeal permit this court to judge for itself the applicability of Exemption 5. We therefore must remand this issue so that the District Court in the first instance may properly analyze whether the documents meet the two requirements discussed above and so fall within Exemption 5. The following comments should guide the lower court in its determination.

a. *Pre-decisional nature of documents.*

■■■ To ascertain whether the documents at issue are pre-decisional, the court must first be able to pinpoint an agency decision or policy to which these documents contributed. The agency bears the burden of establishing the character of the decision, the deliberative process involved, and the role played by the documents in the course of that process. *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 868 (D.C.Cir. 1980); *see also NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 138, 95 S.Ct. 1504, 1510, 44 L.Ed.2d 29 (1975). Unfortunately, the Government has thus far failed to sustain this burden. Only at oral argument before this court did the Government attempt to clarify the pre-decisional nature of these documents, contending that the documents had been generated as part of a joint congressional and agency investigation into Paisley's death, undertaken to decide: (1) whether to propose new legislation, and (2) whether to initiate any criminal prosecution in connection with the death.

■■■ Since on the basis of the record currently before the court we are unable to ascertain whether the disputed documents played any role in arriving at either decision, the District Court must conduct a more detailed inquiry into whether and how these documents were used to arrive at these, or any other, decisions.[53] We do note at this point our reservations that a decision by *Congress* to initiate legislation can be

---

**53.** It seems quite plausible, for example, that the CIA might well have had other, independent, reasons for investigating Paisley's death. Conceivably the agency might seek to investigate the facts surrounding this unusual death in connection with its general policies toward employee safety and security. The results of such factual investigations undertaken by agencies have been held to fall within the scope of Exemption 5. *See Playboy Enterprises, Inc. v. Dep't of Justice,* 677 F.2d 931 (D.C.Cir.1982) (investigation by Justice Department into possible government misconduct during civil rights movement of the 1960's); *Cooper v. Dep't of the Navy,* 594 F.2d 484 (5th Cir.1979), *cert. denied,* 444 U.S. 926, 100 S.Ct. 266, 62 L.Ed.2d 183 (1979) (investigation by Navy into helicopter crash).

construed as an *agency* decision for FOIA purposes.[54] However, a decision as to whether or not to prosecute someone in connection with Paisley's death may well be such an agency decision; if so, the information-gathering and deliberative process that produces the decision is precisely the type of material to be protected as pre-decisional under Exemption 5.[55] On remand, the District Court should also determine the role normally played by the CIA and the FBI in initiating or advising about such prosecutions.

### b. *Deliberative nature of documents.*

 If, on remand, the District Court finds that the documents did play a role in some agency decisionmaking process, the documents must yet be shown to be "deliberative" to be protected under Exemption 5. It is well established that purely factual material which is severable from the opinion or policy advice in a document is generally not protected and must be disclosed in a FOIA suit. *See EPA v. Mink, supra,* 410 U.S. at 91, 93 S.Ct. at 838; *Mead Data Central, Inc. v. Dep't of the Air Force,* 566 F.2d 242, 260–261 (D.C.Cir.1977); K. DAVIS, ADMINISTRATIVE LAW §§ 5:33, 5:34,

at 404–407 (2d ed. 1978). However, even factual material may come within Exemption 5 if "the manner of selecting or presenting those facts would reveal the deliberative process, or if the facts are 'inextricably intertwined' with the policymaking process." *Ryan v. Dep't of Justice, supra,* 617 F.2d at 790 (*quoting Soucie v. David,* 448 F.2d 1067, 1078 (D.C.Cir.1971)) (footnotes omitted).[56] But this exception cannot be read so broadly as to undermine the basic rule; in most situations factual summaries prepared for informational purposes will not reveal deliberative processes and hence should be disclosed. *See, e.g., ITT World Communications, Inc. v. FCC,* 699 F.2d 1219, 1239 (D.C.Cir.1983); *Playboy Enterprises, Inc. v. Dep't of Justice,* 677 F.2d 931 (D.C.Cir.1982).

From the *Vaughn* indices submitted, most of the requested documents do appear to be straightforward, factual summaries of meetings and phone conversations between SSCI and CIA staff personnel. However, because of its holding on the Speech or Debate Clause issue, the District Court declined to make findings as to the nature or segregability of the information contained in these documents. Therefore, on remand

---

**54.** The Government relies on *Ryan v. Dep't of Justice,* 617 F.2d 781 (D.C.Cir.1980), as support for the proposition that Exemption 5's "deliberative process" privilege extends to documents communicated between an agency and Congress. There are, however, two important distinctions to be made between the factual situation in *Ryan* and that of the instant case. First, in *Ryan* the disputed documents—Senators' responses to Department of Justice questionnaires—were created in response to an *agency* request. Here, the mirror image exists—agency responses to congressional requests for information. Second, the Justice Department in *Ryan* was clearly an agency within FOIA engaged in the adoption of an agency policy. In this case, it may well be that *Congress* is the only body engaged in decisionmaking—*i.e.* in deciding whether and what kind of new legislation to adopt as a result of the circumstances surrounding Paisley's death. Without further briefing and development of the record, we are not prepared to say whether such a decision might constitute an agency decision as used in the Exemption 5 context. Nor are we prepared to say that precisely the same type documents generated by an agency prior to its own decision are protected from disclosure but become

unprotected if generated as the basis of a congressional decision.

**55.** As one court has noted, "Exemption [5] is tailor-made for the situation in which [a prosecutor is] assessing the evidence [he is] compiling. To expose this process to public scrutiny would unnecessarily inhibit the prosecutor in the exercise of his traditionally broad discretion to assess his case and decide whether or not to file charges." *Fund for Constitutional Gov't v. Nat'l Archives & Records Service,* 485 F.Supp. 1, 13 (D.D.C.1978), *aff'd in part and rev'd in part on other grounds,* 656 F.2d 856 (D.C.Cir. 1981).

Of course, no problem is posed by the fact that the agencies' investigation did *not* result in any prosecution since, as we have held in analogous contexts, "the rejection of a policy does embody a decision." *Common Cause v. IRS,* 646 F.2d 656, 660 (D.C.Cir.1981).

**56.** *See also Montrose Chemical Corp. v. Train,* 491 F.2d 63 (D.C.Cir.1974) (factual summaries prepared to aid EPA administrator in complex decision exempt under FOIA because disclosure would reveal selection and decisionmaking processes of administrator).

the court is directed to determine precisely which documents or portions thereof should be released as severable factual material whose disclosure would not reveal the deliberative process.

## 2. *Exemptions 1 and 3.*

Finally, the Government asserts on appeal that certain documents held by the CIA are also exempt from disclosure pursuant to Exemptions 1 and/or 3, 5 U.S.C. § 552(b)(1) and (3).[57] Exemption 1 allows withholding of documents that have been authorized by Executive Order to be kept secret in the interest of national defense and foreign policy and that have been properly classified.[58] Exemption 3 protects documents that have been specifically exempted from disclosure by statute.[59] The Government claims that the documents at issue are properly classified pursuant to Executive Order and therefore are protected by Exemption 1. Furthermore, the documents contain information about the official activities of CIA employees and about CIA organization and procedures explicitly exempted from disclosure by 50 U.S.C. §§ 403(d)(3) and 403g (1976). Thus the CIA could properly invoke the protection of Exemption 3.

Since the District Court resolved the case on other grounds, it never considered these exemptions. On remand, the District Court should rule on the applicability of Exemptions 1 and 3. As with its Exemption 5 procedure, the District Court must order that all "reasonably segregable" nonexempt portions of the documents be released to appellant.[60] The burden once again lies with the agencies to demonstrate that no segregable, nonexempt portions remain withheld from appellant.[61]

## IV. CONCLUSION

Since we find that the 58 disputed documents withheld by the FBI and the CIA are agency records whose release is not barred by the Speech or Debate Clause, they must be released to appellant absent a showing that the documents or portions thereof come within specific FOIA exemptions. On remand, therefore, the District Court shall afford the Government an opportunity to justify adequately its withholding of these documents pursuant to Exemptions 1, 3, and 5. It may be necessary for the District Court to order submission of further affidavits or to conduct an *in camera* inspection of the documents.[62] The District Court should order the immediate release of any

---

**57.** The Government claims that 28 of the 55 CIA documents are being withheld pursuant to Exemptions 1 and/or 3. At oral argument the exact number was disputed by appellant's counsel. Our own examination of the Doswell Affidavit shows that the CIA asserted these exemptions for 26 documents: OLC Nos. 4, 6, 14, 15, 16, 18, 19, 20, 21, 22, 23, 24, 25, 26, 28, 30, 33, 34, 37, 39, 46, 47, 51, 52, 56, 57. *See* Doswell Affidavit at 8–27, JA 131–150.

**58.** 5 U.S.C. § 552(b)(1) (1982). The exemption reads:

(b) This section does not apply to matters that are—

(1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order[.]

**59.** 5 U.S.C. § 552(b)(3) (1982). The exemption reads:

(b) This section does not apply to matters that are—

\* \* \* \* \* \*

(3) specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld[.]

**60.** *See* 5 U.S.C. § 552(b) (1982).

**61.** *See Allen v. CIA,* 636 F.2d 1287, 1293 (D.C. Cir.1980); *Ray v. Turner,* 587 F.2d 1187, 1214 (D.C.Cir.1978) (Wright, C.J., concurring).

**62.** If the Government's affidavits fail to meet the standards of specificity set forth by this court, *see Hayden v. Nat'l Security Agency,* 608 F.2d 1381, 1387 (D.C.Cir.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980), then the District Court should consider *in camera* inspection of the documents. *See Holy Spirit Ass'n for Unification of World Christianity v. CIA, supra* note 36, 636 F.2d at 845; *Allen v. CIA, supra* note 61, 636 F.2d at 1298–1299 (considerations supporting *in camera* inspection).

purely factual material not falling within the ambit of Exemptions 1, 3, and 5. Finally, the District Court shall permit the FBI to provide an updated justification for withholding all or any part of the five documents previously dismissed from the case and shall order release of any material found to be improperly withheld.

The judgment of the District Court is vacated and the case is remanded for further proceedings in accordance with this opinion.

*So ordered.*