**NATIONAL SECURITY ARCHIVE, Plaintiff,**

**v.**

**FEDERAL BUREAU OF INVESTIGATION, Defendant.**

**Civ. A. No. 88–1507–LFO.**

United States District Court, District of Columbia.

March 18, 1991.

Michael S. Horne, Martin Wald, Covington & Burling (Elliott Mincberg, People for the American Way, Sheryl Walter, Nat. Security Archive, of counsel), Washington, D.C., for plaintiff.

Nathan Dodell, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

Plaintiff National Security Archive is a nonprofit research institute and library whose main function is to discover, analyze, and index documents relating to national security matters. It also organizes these documents into sets which it makes available to libraries, scholars, journalists, Members of Congress, and the general public.

In July 1987, the Archive filed a request under the Freedom of Information Act ("FOIA"), see 5 U.S.C. § 552(b) (1988), with defendant Federal Bureau of Investigation for documents concerning the FBI's "Library Awareness Program." The FBI instituted that program in response to perceived activity by foreign agents in technical libraries across the country.[1] The FBI suspects that Soviet agents have been at-

tempting to gain access to sophisticated scientific and technical information through the National Technical Information Service. Although that Service is open to the general public, an Executive Order bars Soviet nationals from access to it. The FBI also suspects Soviet agents of using libraries to recruit both librarians and students. According to the FBI, the Library Awareness Program, which was implemented by its New York office, responds to these threats to national security. For the most part, its purpose is simply to alert librarians in twenty-one technical libraries in the New York metropolitan area of suspected Soviet activities and to inform them how to report such activities. Other libraries and librarians have been contacted in response to specific reports of Soviet activity. The FBI, however, does not consider these investigations to be part of the Library Awareness Program.

On July 10, 1987, the Archive requested information concerning the Library Awareness Program from FBI Headquarters. Two months later, it submitted an additional request to the New York office. The FBI initially denied these requests on the grounds that there were no responsive records. In October 1987, the FBI corrected itself and informed the Archive that its earlier determination had been in error and that it would be processing the Archive's requests. By June 1988, however, the FBI had not released any documents. Accordingly, on June 2, 1988, the Archive filed this suit. Later that month, the FBI produced 22 documents. After the Archive challenged the adequacy of the FBI's search and a hearing on the subject was held, the parties entered into a stipulation. Following that stipulation, which was filed May 1, 1989, the FBI reviewed more than 2,000 pages of records. Invoking Exemptions 1, 2, 5, and 7 of the FOIA, the FBI withheld many of these documents entirely and redacted large portions of others. For

---

1. This description of the Library Awareness Program is drawn from testimony by James H. Geer, the Assistant Director of the Intelligence Division of the FBI, on July 13, 1988 before the House Subcommittee on Civil and Constitution-

al Rights. A transcript of that testimony was filed by defendant on November 26, 1990 and will be referred to as "Testimony of James H. Geer."

approximately two hundred of these documents, the FBI filed *Vaughn* indexes describing the information withheld.

Based upon those declarations, the parties filed cross-motions for summary judgment. A hearing on those motions was held on November 14, 1990. On November 15, 1990, an Order informed the parties that the matter remained under advisement because the record did not provide a sufficient basis for a judgment. The Order also required the FBI to file *in camera* affidavits concerning most of the information withheld under Exemption 1 and a copy of the briefing book that Geer used to prepare for his testimony before Congress. Finally, the Order required the FBI to file publicly a copy of Geer's testimony and an affidavit concerning whether or not the names of policymaking officials had been withheld under Exemption 7(C). This Memorandum explains and modifies that Order.

## I. NATIONAL SECURITY

▆ Under Exemption 1, an agency need not disclose materials that are

(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order....

5 U.S.C. § 552(b)(1) (1988). To properly invoke this exemption, the FBI must show that it has complied with the classification procedures established by the relevant Executive Order and that it has withheld only material properly classified under that order's substantive criteria for classification. *See, e.g., King v. United States Dep't of Justice*, 830 F.2d 210, 214 (D.C.Cir.1987). The Archive does not challenge the validity of the procedures followed by the FBI.

Moreover, it does not directly challenge the FBI's application of the relevant criteria for classification. Instead, the Archive criticizes the sufficiency of the description in the FBI's *Vaughn* index of those justifications and of the passages withheld.

### A.

▆ The Archive's focus upon the sufficiency of the FBI's *Vaughn* indexes reflects the nature of the review of Exemption 1 claims. Because judges "lack the expertise necessary to second guess [ ] agency opinions in the typical national security FOIA case," *Halperin v. CIA*, 629 F.2d 144, 148 (D.C.Cir.1980), courts accord substantial weight to the determination of Executive Branch officials that information is properly classified. *See* S.Rep. No. 93–1200, 93d, Cong., 2d Sess. 12 (1974), U.S. Code Cong. & Admin.News 1974, p. 6267; *Abbotts v. Nuclear Regulatory Comm'n*, 766 F.2d 604, 606 (D.C.Cir.1985). As a consequence, even though the Government has the burden of proving *de novo* that any information it has withheld fits under one of the exemptions to the FOIA, *see* 5 U.S.C. § 552(a)(4)(B) (1988),[2] in the national security context that burden is relatively light. An agency's declarations need merely:

describe the withheld information with reasonable specificity, demonstrating a logical connection between the information and the claimed exemption, and ... evidence neither bad faith on the part of the agency nor a conflict with the rest of the record....

*Salisbury v. United States*, 690 F.2d 966, 970 (D.C.Cir.1982) (citations omitted). Thus, the primary focus of any challenge to a decision to withhold information as classified is normally upon the sufficiency of the description of that decision, rather than upon its reasoning.

---

**2.** 5 U.S.C. § 552(a)(4)(B) provides in full:
On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the

complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action.

In the seminal case of *Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir.1973), *cert. denied* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), our Court of Appeals set forth the standards for, absent evidence of bad faith, judging the sufficiency of such declarations. In the first place, the declaration must contain a detailed justification for the invocation of each exemption. *See id.* at 826–27. The declaration must also "specify in detail which portions are disclosable and which are allegedly exempt." *Id.* at 827. This is usually accomplished "by formulating a system of itemizing and indexing that would correlate statements made in the Government's refusal justification with the actual portions of the document." *Id.* (footnote omitted).

### B.

■ Upon initial inspection, the Government's *Vaughn* indexes seem to be satisfactory. In support of its invocation of Exemption 1, the FBI submitted two declarations by a top secret classification and declassification authority. *See* Declaration of Susan Delia Pruet (filed April 12, 1990) [hereinafter, "Pruet II"]; Declaration of Susan Delia Pruet (filed February 12, 1990) [hereinafter, "Pruet I"]. These declarations meet *Vaughn*'s requirement of specificity. Each document is described separately. The description begins with a listing of basic information: document number or numbers, file references, date, number of pages, and a brief indication of the contents such as "question 36 from the briefing book" or "airtel from New York." Pruet I ¶¶ 35, 52. The location of the segments withheld on the page is, if the page was disclosed,[3] identified. Finally, the contents of each segment withheld is described, and the justification for withholding is set forth in the following paragraph or in a referenced paragraph. Thus, the FBI's *Vaughn* index seems to adequately describe, separate, and index each segment of information withheld.

The justifications in that *Vaughn* index also seem to be adequately detailed. There are thirteen or so of them, normally of ten to twenty lines. *See* Pruet I ¶¶ 20, 22, 31, 34, 41, 48, 54, 56, 58, 60, 61, 63, 65. Although these rationales are often couched in general terms such as "[d]isclosure of a particular intelligence activity would permit hostile entities to assess" FBI counterintelligence operations, *id.* ¶ 34, that level of generality is often necessary to avoid "compromis[ing] the secret nature of the information." *Hayden v. National Security Agency/Central Security Serv.,* 608 F.2d 1381, 1384–85 (D.C.Cir.1979), *cert. denied* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980), *quoting Vaughn v. Rosen,* 484 F.2d at 826. The fact that justifications are adopted by succeeding paragraphs is not a problem either. *See Keys v. United States Dep't of Justice,* 830 F.2d 337, 349 (D.C.Cir.1987) (holding that a *Vaughn* index need not contain "phony individualization" or "meaningless variations of language at each invocation of a specific exemption").

### C.

Although the FBI's *Vaughn* index seems on the surface to be adequate, the Archive contends that it in fact suffers from pervasive inadequacies. In particular, the Archive contends that the descriptions of the withheld documents are often too vague, that the justifications for withholding are not thorough enough, and indeed that at points the index is simply unintelligible. These defects, the Archive contends, require rejection of the Pruet Declarations. Because most of these criticisms are off the mark, they do not require rejection of the FBI's *Vaughn* indexes.

The Archive criticizes the specificity of the Government's *Vaughn* index at several points. It contends that the index is vague and often confusing. The confusion is, however, largely the product of the Archive's strained reading of these passages. For instance, the Archive contends that the

---

**3.** Copies of those pages are appended to the declarations of Angus Llewellyn. *See* Declaration of Angus B. Llewellyn (filed April 12, 1990) [hereinafter, "Llewellyn II"]; Declaration of Angus B. Llewellyn (filed February 12, 1990) [hereinafter, "Llewellyn I"].

description "relat[ing] to an intelligence target and his intelligence gathering activities," Pruet I ¶ 118, is too vague to support the FBI's justification for withholding a particular passage. The paragraph goes on, however, to explain that "[t]he intelligence target is identified by name, position, file number associated with this particular individual and locations frequented by this target during certain time frames." *Id.* This description is certainly thorough enough to indicate that disclosure of that information "could allow a hostile intelligence entity to determine the criteria utilized by the FBI to decide what actions by a specific individual warrant the commencement of an investigation." *Id.* ¶ 41; *see also id.* ¶ 118 (incorporating the justification in ¶ 41).

In another instance, the Archive argues that the description of documents 020007–10 is misleading because, while the description of the information withheld refers to specific operations and suggests that the whole document refers to a specific investigation, the disclosed portion of the document indicates a more general purpose of proposing "investigative action in an attempt to counter this KGB activity." No reasonable reader would, however, fail to look first at the disclosed portion, which appears at the beginning of the document. Once this is done, the contents of even this heavily redacted document becomes clear: The document proposes a response to identified KGB activity, and in the course of doing so it discusses the evidence of that activity.

■ The Archive's criticism of the justifications in the *Vaughn* index are similarly unpersuasive. For example, the FBI has justified its decision to withhold code names and designator symbols on the grounds that they may be used in a mosaic analysis by hostile intelligence officers. The Archive vigorously argues that the FBI cannot raise the specter of mosaic analysis to justify withholding any information; the FBI must offer "some more concrete reason to consider a particular piece of information to be a potentially sensitive part of a 'mosaic.'" Plaintiff's Motion for Summary Judgment at 15 n. 3. Such a reason is, however, plain from the FBI's explanation of mosaic analysis:

> Mosaic analysis is an elimination of common denominator deductive process ... whereby a trained hostile analyst, through review of innocuous type pieces of information within a document or a series of documents, will draw accurate conclusions ... and determine the identity of a specific intelligence source, method or activity.

Pruet Declaration I ¶ 65. If a hostile analyst has code names or designator phrases, he or she has a "common denominator" for all the information concerning a particular source, method, or activity. With that common denominator, that analyst can place seemingly unrelated information into a picture of a particular aspect of the FBI's counterintelligence operations. Without such a common denominator, the analyst may not even be able to begin constructing the mosaic. The information is therefore properly withheld because it would contribute to mosaic analysis of other information.

At some points, the Archive seems to be attacking the use of abstract terms in *Vaughn* indexes. Our Court of Appeals has, however, found that abstract terms may be specific enough. *See, e.g., Goland v. CIA,* 607 F.2d 339, 351 (D.C.Cir.1978) (finding "intelligence collection and operational devices" and "intelligence methodologies of a friendly foreign government" to be sufficiently detailed descriptions of withheld materials). Moreover, the Archive's criticism of specific passages is not persuasive. For instance, the Archive contends that the description "the identity of a particular type of intelligence target" is too vague. The FBI persuasively counters that it must withhold the identity of the type of target that it pursues because, if a hostile intelligence service knew what type of targets the FBI investigated, that service could "determine the criteria utilized by the FBI to decide what actions by a specific individual warrant the commencement of an investigation." Pruet I ¶ 41. The description in the Pruet Declarations is more than specific enough to demonstrate the applicability of the rationale offered.

The cases cited by the Archive do not require a different conclusion. The Archive argues that *Allen v. CIA,* 636 F.2d 1287, 1292–93 (D.C.Cir.1980), stands for the proposition that terms like "intelligence sources and methods" and "process" are not specific enough. *See* Plaintiff's Motion for Summary Judgment at 15 n. 4. In *Allen,* however, there was a special need for detail: The Government admitted that the sequence of events in question had "been the subject of a number of other documents which have been released for public access." *See Allen,* 636 F.2d at 1292 (quotation omitted). Thus, in order to justify its withholding of these documents, it had to indicate whether or not the information withheld was apparent from other documents already made public. The affidavits in *Allen* were not reasonably specific because they failed "to indicate whether the disclosure of this document will hasten the 'eventual identification of . . . intelligence methods' that would likely occur even without disclosure of the document." *Id.* at 1293. Nothing in *Allen* suggests that the mere use of abstract terms renders a *Vaughn* index inadequate.

Similarly, *King v. United States Dep't of Justice* lends little support to the Archive's claim that the Pruet Declarations are too vague. In that case, the Court of Appeals stated that "[t]he availability of categorization does not . . . supplant the demand for particularity." *King,* 830 F.2d at 224 (footnote omitted). It did so, however, in the context of an index that did not describe each withheld segment, but rather placed beside each withheld segment a code referencing a justification for classification in the affidavit. *See id.* at 220. The Court of Appeals therefore stressed the need for a particular description of each segment withheld. *See id.* at 224. However, in this case the Pruet Declarations describe each segment withheld. *See supra* 875–76, 878.

▪ Underlying the Archive's criticisms of the Pruet Declarations seems to be the suspicion that the FBI is not acting in good faith. Abstract statements such as the ones the Archive has criticized are sufficiently detailed to demonstrate the reason-ing employed by the government; they are not sufficiently detailed to allow the Court or the plaintiff to verify that the documents actually say what the government says they do. However, courts must presume that a reasonably specific affidavit is accurate and truthful, unless the plaintiff presents evidence of inconsistencies in the affidavits or other evidence that the agency has acted in bad faith. *See, e.g., Gardels v. CIA,* 689 F.2d 1100, 1104 (D.C.Cir.1982); *Hayden,* 608 F.2d at 1387; *Weissman v. CIA,* 565 F.2d 692, 697 (D.C.Cir.1977). As a consequence, the Archive has not presented evidence of either bad faith or inconsistencies in the Pruet Declaration such as might overcome the presumption of agency regularity.

### D.

The Archive does, however, point out several specific deficiencies in the Pruet Declarations.

For example, in paragraph 67 the first Pruet Declaration describes a segment of withheld information as "regarding the dissemination of the source information." The next paragraph justifies withholding of that information on the grounds that it would "lead to the exposure of an intelligence source" and then goes on to describe the damage such an exposure could cause. Pruet I ¶ 68. The declaration does not, however, explain what "information regarding the dissemination of the source information" is, nor does it explain how disclosure of such information could lead to exposure of the source. As a consequence, this justification cannot be said to demonstrate a logical connection between the information and the exemption claimed. Another part of the declaration describes certain withheld information as "channelization/dissemination instructions." *See id.* ¶ 19. It is unclear what such information is. As a consequence, it is unclear why "instructions for channelization/dissemination of this information may contain the subject matter or target of the intelligence report and the locale of the intelligence gathering activity." *See id.* ¶ 20. Finally, the FBI withholds certain information be-

cause it "contains language which is standard terminology that appears in most, if not all, intelligence type investigations." *See id.* ¶ 31. Such information, according to the FBI, would reveal the "depth" of the FBI's knowledge on certain intelligence subjects and targets as well as the intensity of FBI activity. The Pruet Declarations do not, however, explain how revealing standard terminology would disclose the "depth" of the FBI's knowledge about a particular target, nor indeed what those declarations mean by "depth."

The FBI dismisses these criticisms as "flyspecking" that does not go to the heart of the *Vaughn* index. This response has considerable merit to it. These criticisms do not rebut the presumption that the Pruet Declarations were submitted in good faith and represent a reasonably thorough investigation of each segment withheld. Nor do the Archive's criticisms undermine the fact that the Pruet Declarations contain detailed justifications and describe each segment withheld with specificity. Nevertheless, the FBI must still explain these particular passages.

Accordingly, an accompanying order will vacate the Order of November 15, 1990 insofar as it required the defendant to file additional *in camera* affidavits covering materials deleted under exemption 1. Instead, the accompanying order will require the FBI to file additional public affidavits explaining paragraphs 20, 31 and 68 of the first Pruet declaration.

## II.  INTERNAL RULES AND PRACTICES

Under 5 U.S.C. § 552(b)(2), the Government may withhold materials "related solely to the internal personnel rules and practices of an agency." The FBI has invoked this exemption to delete room numbers and telephone extensions of FBI employees familiar with the Library Awareness Program. As the Archive has not opposed the Government's invocation of this exemption, the accompanying order will enter partial summary judgment as to all material withheld under Exemption 2.

## III.  DELIBERATIVE PROCESS

To prepare him for his testimony before the House Subcommittee on Civil and Constitutional Rights on the Library Awareness program, FBI agents prepared for James Geer a briefing book. *See* Declaration of Linda L. Reel ¶ 4. The book summarizes the objectives of the programs and documents the use of libraries by foreign agents. *See id.* It also contains possible questions and proposed answers to those questions. *See id.* The FBI now contends that that book is protected by the deliberative process privilege. That contention is not persuasive.

■ Under 5 U.S.C. § 552(b)(5), the Government may withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." In other words, the Government need not disclose any materials under the FOIA that it would be able to withhold from discovery. Here, the Government invokes the deliberative process privilege, a form of executive privilege. *See NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 150, 95 S.Ct. 1504, 1516, 44 L.Ed.2d 29 (1975). This privilege is designed to permit "agency decision makers to engage in that frank exchange of opinions and recommendations necessary to the formulation of policy." *Paisley v. CIA,* 712 F.2d 686, 698 (D.C.Cir.1983) (citing S.Rep. No. 813, 89th Cong., 1st Sess. 9 (1965)), *vacated in unrelated part,* 724 F.2d 201 (1984); *accord Jordan v. U.S. Dep't of Justice,* 591 F.2d 753, 772–74 (D.C. Cir.1978) (en banc)). Specifically, the privilege

serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a

course of action which were not in fact the ultimate reasons for the agency's action.

*Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 866 (D.C.Cir.1980) (citing *Jordan,* 591 F.2d at 772–74). Congress has, however, instructed courts to "delimit the exception as narrowly as consistent with efficient Government operation." S.Rep. No. 813 at 9. As a consequence, the deliberative process exemption may be invoked only for information that is both "predecisional" and "deliberative." *See, e.g., Am. Fed'n of Governmental Employees v. U.S. Dep't of Commerce,* 907 F.2d 203, 207 (D.C.Cir.1990); *Coastal States,* 617 F.2d at 866; *Jordan v. U.S. Dep't of Justice,* 591 F.2d at 774.

Our Court of Appeals has recently attempted to clarify the distinction between the predecisional and deliberative criteria. Writing for the Court in *Access Reports v. Dep't of Justice,* 926 F.2d 1192 (D.C.Cir. 1991), Judge Williams notes that although these criteria have often been blended together, *see id.* at 1194–95, they are best thought of as focusing on different functions:

> While the "predecisional" label clearly focuses attention on the role of the entire document in the decisionmaking process, the "deliberative" criterion may be useful in distinguishing between privileged and non-privileged material within a single "predecisional document."

*Id.* at 1195. Thus, in Judge Williams' formulation, the predecisional criterion provides a threshold test that distinguishes between documents whose disclosure may unduly impinge upon agency decisionmaking and documents whose disclosure cannot. For example, disclosure of documents that comment upon decisions already made do not impinge upon decisionmaking, *see NLRB v. Sears, Roebuck & Co.,* 421 U.S. at 151–52, 95 S.Ct. at 1516–17 nor does disclosure of proposals that have actually been adopted, *see id.* at 152–53, 95 S.Ct. at 1517–18. Once the predecisional threshold has been met, it is then necessary to determine whether particular material within a document is sufficiently "deliberative" that disclosure of it would "discourage candid

discussion within the agency." *Access Reports,* 926 F.2d at 1195 (quotation and quotation marks omitted).

■ Under this formulation, the briefing book is predecisional. It is "[a] document from a junior to a senior" that might reflect the junior official's "own subjective opinions and will clearly have no binding effect on the recipient." *See id.* at 1195. Moreover, like the memo that Justice Department sought as "ammunition for the expected fray" in front of Congress in *Access Reports, see id.* at 1196, the briefing book was being prepared to help senior agency officials determine how to present a program to Congress. Because it is possible that such a document might contain specific material exempted from disclosure under the deliberative process exemption, it is a predecisional document.

The FBI has not, however, shown that any of the material in that document is in any way "antecedent to the adoption of agency policy," *Jordan,* 591 F.2d at 774, offered grounds "as yet only a personal position," *Paisley v. CIA,* 712 F.2d at 698, involved the "give-and-take of the consultative process," *Coastal States,* 617 F.2d at 866, exhibited the "careful weigh[ing of] arguments for and against various outcomes before announcing a winner," *Access Reports,* 926 F.2d at 1194, or indeed displayed any "deliberative" characteristics. Indeed, there is no indication that any policy options were even considered in connection with Geer's Congressional testimony. To the contrary, in his opening statement, Geer noted that he was *explaining* the program, not modifying it in any way. *See* Testimony of James H. Geer at 110. Its question-and-answer format also indicates that the briefing book's focus was upon reporting facts, not weighing policies.

■ The FBI nonetheless contends that the briefing book is deliberative because the staff members preparing the books had to develop the questions and answers in the book. They do not, however, explain how revealing the fruits of their labors would discourage candid discussion within the agency or otherwise burden the agency's

deliberative process. Moreover, it is well-settled that

> a report does not become a part of the deliberative process merely because it only contains those facts which the person making the report thinks material. If this were not so, every factual report would be protected as part of the deliberative process.

*Playboy Enterprises, Inc. v. Dep't of Justice,* 677 F.2d 931, 935 (D.C.Cir.1982); *accord ITT World Communications, Inc. v. FCC,* 699 F.2d 1219, 1239 (D.C.Cir.1983), *cert. denied* 466 U.S. 463, 104 S.Ct. 1936, 80 L.Ed.2d 480 ((1984). Thus, as a general rule, factual summaries do not qualify as deliberative. *See Wolfe v. Dep't of Health and Human Services,* 839 F.2d 768, 774 (D.C.Cir.1988) (en banc); *Paisley v. CIA,* 712 F.2d at 699; *cf. Access Reports,* 926 F.2d at 1195 ("[T]he opinion-fact line that we have often used as a rough guide to separate exempt from non-exempt material grows out of the 'deliberative' requirement.") (citations omitted).

▮▮▮ The fact/opinion distinction should not, however, be "mechanically applied." *Wolfe,* 839 F.2d at 774. Factual information may be withheld whenever disclosure of such information would "so expose the deliberative process that it must be deemed covered by the privilege." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force,* 566 F.2d 242, 256 (D.C.Cir.1977) (*Mead* I). Exceptions to the general rule requiring disclosure of factual information fall into three general categories. The first category is straightforward: Exemption 5 does not exalt form over substance; therefore, reports of recommendations are protected just like the recommendations themselves. *See Ryan v. Dep't of Justice,* 617 F.2d 781, 791 (D.C.Cir.1980) (holding that questionnaires sent by Attorney General to Senators seeking advice on judicial selections are exempt from disclosure); *Mead* I, 566 F.2d at 257 (holding that transcripts of negotiating strategy sessions are exempt from disclosure). Second, factual information is not disclosable if it can be used to discover the mental processes of the agency. *See Dudman Communications Corp. v. Dep't of Air Force,* 815 F.2d

1565 (D.C.Cir.1987) (draft of air force history); *Montrose Chemical Corp. v. Train,* 491 F.2d 63 (D.C.Cir.1974) (memorandum summarizing testimony prepared for agency official before that official renders final judgment). Finally, factual information is not disclosable if disclosure of that information might deter the agency from seeking valuable information. *See Quarles v. Dep't of Navy,* 893 F.2d 390, 393 (D.C.Cir. 1990) (cost analysis of potential ports); *Mead Data Cent., Inc. v. U.S. Dep't of Air Force,* 575 F.2d 932, 936 (D.C.Cir.1978) (*Mead* II) (analysis of proposed computerized legal research system).

The briefing book does not fall into any of these categories. There is no indication that the briefing book reports recommendations or other materials that would otherwise be protected under Exemption 5, or that the briefing book could be used to gain insight into the mental processes of the agency. The Government contends that disclosure of the briefing book would inhibit it from using the useful tool of briefing books in the future, but it does not explain how. In *Quarles,* by contrast, the Government had a specific reason for not disclosing cost information: The Navy often chooses ports with noneconomic reasons in mind, but "disclosure of the finding surely would tend to undermine the acceptability—among taxpayers—of forsaking that option." *Quarles,* 893 F.2d at 393. Thus, if such information were disclosable, "high officials might be inclined either not to call for cost estimates, or to call only for fuzzy ones expressed as wide ranges." *Id.* Here, by contrast, the FBI has failed to "show by specific and detailed proof that disclosure would defeat, rather than further, the purposes of the FOIA." *Mead* I, 566 F.2d at 258 (citation omitted).

The FBI also contends that the withholding of briefing materials is supported by precedent, *see Washington Post Co. v. Dep't of Defense,* No. 84–2929 (D.D.C. Feb. 25, 1987); *Williams v. U.S. Dep't of Justice,* 556 F.Supp. 63, 65 (D.D.C.1982). Once analyzed, however, these cases do not lend support to the FBI's position. In *Washington Post Co. v. Dep't of Defense,* the

Government withheld the Woerner Report, a document "produced to assist the Joint Chiefs of Staff in determining the course the United States Defense Department should take in aiding the El Salvadorans develop a military strategy." *Washington Post Co. v. Dep't of Defense*, No. 84–2949, slip op. at 20. Like the briefing book, the Report summarized factual information, in that case concerning the political and military situation in El Salvador. Unlike the briefing book, the Woerner Report also evaluated the situation in El Salvador, assessed the comparative capabilities of the government and the opposition, and made specific recommendations for future action. *See id.* at 21. Due to this "candid evaluation of the alternatives to be implemented," the Court found the report to be deliberative. *See id.* Because there is no analogous evaluation of alternative policies in this case, *Washington Post Co. v. Dep't of Defense* lends no support to the contention that the briefing book is covered by the deliberative process privilege.

*Williams v. U.S. Dep't of Justice*, 556 F.Supp. 63, is more enigmatic, but it too lends little support to the FBI's position. In *Williams*, the Court found that "briefing papers prepared for the Attorney General prior to an appearance before a congressional committee in executive session" were "clearly deliberative." *See id.* at 65. While the *Williams* Court did not explain the basis of the opinion, it noted that it had made an *in camera* inspection of the briefing book. It would be wrong to infer that the Court exempted the briefing papers merely because they were prepared to brief the Attorney General. On the contrary, it may be fairly inferred from the fact that the Court required an *in camera* inspection that the mere fact the papers in question were used to brief the Attorney General did not exempt them. In any event, there is no showing in this case that the Geer Report was deliberative as that term has been applied.

In summary, the FBI has failed to demonstrate that the briefing book is either predecisional or deliberative. As a consequence, the briefing book as a whole is not protected by the deliberative process privilege. As the Archive itself notes, individual portions of that book may nevertheless not be disclosable under Exemption 5 or other exemptions. To withhold such information, the FBI would need as a first step to provide a supplemental *Vaughn* index describing the passages to be withheld, justifying their withholding, and indexing those justifications to copies of the documents partially disclosed.

Due to the conclusion reached here, it is not necessary to view the briefing book *in camera*. Accordingly, the accompanying order will vacate the Order of November 15, 1990 insofar as it required the FBI to produce the briefing book for *in camera* review.

## IV. LAW ENFORCEMENT RECORDS

Under 5 U.S.C. § 552(b)(7), the Government may withhold "records compiled for law enforcement purposes, but only to the extent" that they fit into one of several enumerated categories.[4] The FBI invokes this exemption to withhold a variety of information, including details of ongoing investigations, names of agents and informants, and investigative techniques. Be-

---

**4.** The six categories cover records or information that

(A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law en-

forcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential position, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual.

5 U.S.C. § 552(b)(7) (1988).

cause it is undisputed that that information was compiled for law enforcement purposes, the only question is whether those records fit under the four claimed exemptions.

### A. *Interference with Enforcement Proceedings*

■ Section 7(A) exempts materials that "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A) (1988). The FBI contends this exemption covers information concerning the FBI's "overall ongoing foreign counterintelligence program directed at hostile intelligence services." Llewellyn II ¶ 19. The FBI reasons that if hostile intelligence officers had that information, they might be able "to develop procedures to thwart our intelligence methods by adjusting their practices or planting disinformation." *Id.* This justification must be rejected. It is well-settled that "[e]xemption 7(A) ... cannot justify withholding unless the material withheld related to a 'concrete prospective law enforcement proceeding.'" *Bevis v. Dep't of State*, 801 F.2d 1386, 1389 (D.C.Cir.1986), *quoting Carson v. U.S. Dep't of Justice*, 631 F.2d 1008, 1019 (D.C.Cir.1980); *see also Coastal States*, 617 F.2d at 870 (observing that "a major reason for the 1974 amendments was to eliminate [use of exemption 7(A)] when there is no enforcement proceeding then pending or contemplated"). The FBI's concern that disclosure of this information will interfere with its counterintelligence operations is important, but it is more properly addressed under Exemption 1. However, because the FBI may be able to identify pending and contemplated enforcement proceedings, the accompanying order will allow the FBI to submit an affidavit asserting whether there are proceedings currently pending or contemplated relating to each segment for which exemption 7(A) has been invoked.

### B. *Unwarranted Invasions of Privacy*

Section 7(C) exempts documents that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C) (1988). Under this exemption, the FBI withholds the identities of its agents and information that might help identify them, the identities of third parties who were interviewed, and the identities of third parties mentioned in the FBI investigative files.

■ Exemption 7(C) does not allow the Government to withhold all information that might invade a person's privacy; the invasion must be "unwarranted." Each individual's interest in privacy must be balanced against the public's interest in release of particular information. *See U.S. Dep't of Justice v. Reporters Committee*, 489 U.S. 749, 762, 109 S.Ct. 1468, 1476, 103 L.Ed.2d 774 (1989). The proper approach is two-step:

> If no significant privacy interest is implicated (and if no other Exemption applies), FOIA demands disclosure. *See Dep't of Justice v. Tax Analysts*, [492 U.S. 136, 109 S.Ct. 2841, 2850–53, 106 L.Ed.2d 112 (1989)]. If, on the other hand, a substantial privacy interest is at stake, then we must weigh that privacy interest in non-disclosure against the public interest in the release of the records in order to determine whether, on balance, disclosure would work a clearly unwarranted invasion of personal privacy. *Ripskis v. HUD*, 746 F.2d 1, 3 (D.C.Cir.1984).

*Nat'l Ass'n of Retired Federal Employees v. Horner*, 879 F.2d 873, 874 (D.C.Cir.1989), *cert. denied sub nom. National Assn. of Retired Federal Employees v. Newman*, — U.S. ——, 110 S.Ct. 1805, 108 L.Ed.2d 936 (1990) (final citation omitted) [hereinafter, *NARFE*]. Although every individual has a generalized interest in "control of information concerning his or her person," *Reporters Committee*, 489 U.S. at 762, 109 S.Ct. at 1476, the weight of the privacy interest in any particular case will depend upon the type of information at issue and the potential uses and misuses of that information. *See NARFE*, 879 F.2d at 876. The public's interest is narrow: It is concerned with promoting open government by scrutinizing agency action or, more generally, knowing "what the government is up to." *Reporters Committee*, 489 U.S. at

772–73, 109 S.Ct. at 1481–82 (quoting Henry Steele Commager) (citations omitted) (emphasis omitted).

■ The FBI contends that its agents have an interest in keeping their identities confidential because, as FBI agents in general and as agents involved with the Library Awareness Program, they may be subject to annoying, "unnecessary, unofficial questioning as to the conduct of the investigations" or harassed by those harboring animosity towards the Program, the FBI, or law enforcement in general. Llewellyn I ¶ 22. Furthermore, because none of the agents identified have any policymaking responsibilities, *see* Declaration of Angus B. Llewellyn ¶ 3 (filed November 26, 1990), the FBI asserts there is little public interest in revealing their names, *see* Llewellyn I ¶ 23. This contention is plainly correct. FBI agents "have a legitimate interest in preserving the secrecy of matters that conceivably could subject them to annoyance or harassment in either their official or private lives." *Lesar v. U.S. Dep't of Justice*, 636 F.2d 472, 487 (D.C.Cir.1980) (footnote omitted). Furthermore, because the names of low-level government employees reveal little of the operation of an agency, there is little public interest in the disclosure of their names. *See Stern v. FBI*, 737 F.2d 84, 94 (D.C.Cir.1984). The FBI has also appropriately deleted other "identifying data." *See Reporters Committee*, 489 U.S. at 769, 109 S.Ct. at 1479.

■ The FBI's attempt to withhold the identities of informants under this exemption is misplaced. It argues that unless assured "that their identities and the information received will be held in the strictest confidence" individuals will not furnish information to the FBI. Llewellyn I ¶ 27. This logic of this argument is impeccable, but it is misplaced. Though important enough to warrant exemption under 7(D), the FBI's interest in maintaining the incentive for individuals to furnish information is not a privacy interest. That interest is covered instead by Exemption 7(D) and more properly analyzed under that exemption.

Finally, the government attempts to withhold the identities of parties merely mentioned in the FBI investigation files. The Llewellyn Declaration asserts that this information was withheld because by the mere fact that they are mentioned in connection with an investigation these persons will suffer "an unearned stigma." Llewellyn I ¶ 28; *cf. Fitzgibbon v. CIA*, 911 F.2d 755, 767 (D.C.Cir.1990) ("It is surely beyond dispute that the mere mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation.") (quotation marks and citation omitted). In its pleadings, however, the FBI argued that the private interest was not the possible stigma, but a generalized interest in controlling one's name. *See* Defendant's Reply at 11. The FBI also inexplicably fails to consider the public's interest in disclosure. The Archive's discussion is only slightly more helpful: It asserts that the public has an interest "in knowing whether government programs such as the Library Awareness Program are collecting and preserving information about innocent citizens." Plaintiff's Response at 10. It does not, however, explain how identifying particular individuals will serve this interest. Further briefing on this subject is necessary.

Accordingly, the accompanying order will grant the government's motion for summary judgment on the withholding of the identities of FBI agents, grant the Archive's motion for summary judgment on the withholding of the identities of FBI informants under Exemption 7(C)—without prejudice of course to withholding the same information under Exemption 7(D)—and schedule further briefing on the withholding of the identities of third parties mentioned in the investigative files.

### C. *Confidential Informants*

Section 7(D) covers materials which could reasonably be expected to disclose the identity of a confidential source ... and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency con-

ducting a lawful national security investigation, information furnished by a confidential source.

5 U.S.C. § 552(b)(7)(D) (1988). Invoking this exemption, the FBI has withheld the identity of, and information furnished by, persons interviewed under express assurances of confidentiality. *See* Llewellyn I ¶¶ 35–40. The FBI also seeks to withhold the identify of and information furnished by persons interviewed under implied assurances of confidentiality. *See id.* ¶¶ 31–34. Although the Government does not provide any information indicating that there was an implied assurance of confidentiality, our Court of Appeals recently held that in the absence of evidence to the contrary assurances of confidentiality will be implied. *See Schmerler v. FBI,* 900 F.2d 333, 337 (D.C.Cir.1990).

The Archive argues that it should at least be given information concerning each informant which it could use to rebut the presumption. Our Court of Appeals, however, has observed that this presumption is "close to an irrebuttable one" precisely because the requester will rarely have any evidence "that the source of an FBI interview in a law enforcement investigation has manifested complete disregard for confidentiality." *Dow Jones & Co. v. Dep't of Justice,* 917 F.2d 571, 577 (D.C.Cir.1990) (footnote omitted); *see also id.* at 578 (noting that because the Government will rarely come forward with information permitting *"either* an inference of confidentiality *or* an inference of nonconfidentiality … the presumption of confidentiality is irrebuttable") (emphasis in original) (Edwards, J., concurring). Although this presumption seems to reverse the standard burden of proof in FOIA, *see id.* at 577–78, the Court of Appeals' decisions are nonetheless binding upon this Court.

### D. *Investigative Technique*

■ Section 7(E) exempts information that

would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could

reasonably be expected to risk circumvention of the law.

5 U.S.C. § 552(b)(7)(E) (1988). The FBI invokes this exemption to withhold "information pertaining to two specific techniques utilized to develop information" which are "lawful and not generally known to the public." Llewellyn I ¶ 42. These contentions are too conclusory and must be supplemented by more detailed information. Exemption 7(E) is properly invoked only for techniques not generally known to the public. *See Albuquerque Pub. Co. v. U.S. Dep't of Justice,* 726 F.Supp. 851, 857 (D.D.C.1989). From the brief description in the *Vaughn* index, it is impossible to determine whether the exemption was properly invoked. Accordingly, the accompanying order will require the FBI to describe the segments withheld under Exemption 7(E) in more detail in a supplemental affidavit. Due to the sensitive nature of this subject, that affidavit may be submitted *in camera* if necessary. *See id.*

### V. CONCLUSION

To summarize, the accompanying order will retain under advisement the issue of the information withheld under Exemption 1. It will also require the FBI to file further public affidavits concerning several of its justifications. *See supra* 878–879. Summary judgment will be entered in favor of the FBI on all passages withheld under Exemption 2 and in favor of the Archive on the briefing book withheld under Exemption 5. The order will, however, allow the FBI to submit further declarations about particular segments of the briefing book which the FBI feels should be withheld. In addition, the accompanying order will grant the FBI summary judgment on all passages withheld under Exemption 7(D) and on the names of FBI agents withheld under Exemption 7(C); summary judgment will be granted in favor of the Archive on the names of informants withheld under Exemption 7(C) without prejudice to their exemption under other provisions. In connection with the material withheld under Exemption 7(A), the FBI will be required to submit additional public affidavits. In connection with Exemption 7(C), the order will

allow the parties to submit additional briefing. Finally, the order will require the FBI to submit *in camera* a supplemental affidavit with respect to materials withheld under Exemption 7(E).

### ORDER

For the reasons stated in the accompanying memorandum, it is this 18th day of March, 1991, hereby

ORDERED: that the Order of November 15, 1990, should be, and is hereby, vacated insofar as

(a) it required the defendant to file an *in camera* affidavit describing in greater detail and in context material withheld under 5 U.S.C. § 552(b)(1) and

(b) it required defendant to file *in camera* a copy of the Geer briefing book; and it is further

NOTICED: that the cross-motions on the material withheld under Exemption 1 remain under advisement; and it is further

ORDERED: that defendant shall on or before March 25, 1991 submit additional affidavits concerning the material described in paragraphs 19, 20, 30, 31, 67 and 68 of the Pruet Declarations; and it is further

ORDERED: that summary judgment should be, and is hereby, granted to the defendant for all material withheld under Exemption 2 and it is further

ORDERED: that summary judgment should be, and is hereby, granted to plaintiff on the issue of the withholding of the entire briefing book under Exemption 5; and it is further

ORDERED: that the defendant may on or before March 25, 1991 file additional affidavits concerning specific passages it wishes to withhold in the briefing book; and it is further

NOTICED: that the cross-motions for summary judgment on the material withheld under Exemption 7(A) remain under advisement; and it is further

ORDERED: that the defendant shall on or before March 25, 1991 submit an affidavit further describing the materials withheld under Exemption 7(A); and it is further

ORDERED: that summary judgment should be, and is hereby, granted to defendant for all names of FBI agents withheld under Exemption 7(C); and it is further

ORDERED: that summary judgment should be, and is hereby, granted to plaintiff for the names of informants withheld under Exemption 7(C); and it is further

ORDERED: that defendant shall on or before March 25, 1991 file a supplemental memorandum on the issue of information concerning the identity of third parties not interviewed by defendant withheld under Exemption 7(C); and it is further

ORDERED: that summary judgment should be, and is hereby, granted to the defendant for all material withheld under Exemption 7(D); and it is further

NOTICED: that the cross-motions for summary judgment concerning the material withheld under Exemption 7(E) remain under advisement; and it is further

ORDERED: that defendant shall on or before March 25, 1991 file an affidavit, which may be submitted *in camera*, concerning the material withheld under Exemption 7(E); and it is further

ORDERED: that plaintiff may file a reply to any submission by the defendant on or before April 8, 1991.